# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                      No. CR 21-0670 JB

KYLE AGUILAR,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the United States' Sealed Objections to the PSR, filed February 9, 2023 (Doc. 79)("Objections"). The primary issues[1] are: (i) whether Defendant Kyle Aguilar is subject to a base offense level of 20 under U.S.S.G. § 2A3.4(a)(1) for having committed his crime by use of force or threats[2]; (ii) whether Aguilar is subject to corresponding 2-level increase under U.S.S.G. § 2A3.4(b)(2), because Jane Doe 1[3] was between the ages of twelve and sixteen at the time of the crime; and (iii) whether Aguilar is subject to a 5-level increase under U.S.S.G. § 4B1.5(b)(1) for being a repeat and dangerous sex offender against

---

[1] The parties do not contest the application of certain adjustments in the Presentence Investigation Report, filed January 24, 2023 (Doc. 77)("PSR"), including: (i) the 2-level increase it provides for victim Jane Doe 1 being in Aguilar's custody and control under U.S.S.G. § 2A3.4(b)(3); and (ii) the 2-level downward adjustment it provides for Aguilar having accepted responsibility for the offense under U.S.S.G. § 3E1.1(a), to which the United States would apply an additional 1-level downward adjustment pursuant to U.S.S.G. § 3E1.1(b), because the United States proposes an offense level above 16, and Aguilar entered a guilty plea. See Objections at 8.

[2] The United States also presents the alternative contention that, if Aguilar's base offense level is not 20 pursuant to U.S.S.G. § 2A3.4(a)(1), then it should be 16 pursuant to U.S.S.G. § 2A3.4(a)(2), on the basis that Aguilar "committed his actions using fear and intimidation." See Objections at 13.

[3] Throughout this Memorandum Opinion and Order, "Jane Doe 1" refers to the victim in this case. "Jane Doe 2" refers to the victim's sister.

minors.  The Court concludes that: (i) a preponderance of the evidence does not support a finding

that Aguilar committed his crime by force or threats under U.S.S.G. § 2A3.4(a)(1), and,

accordingly, a base offense level of 12 applies under U.S.S.G. § 2A3.4(a)(3)[4]; (ii) because Aguilar

is subject to a base offense level of 12 under U.S.S.G. § 2A3.4(a)(3), he is not subject to a 2-level

increase under U.S.S.G. § 2A3.4(b)(2); and (iii) a preponderance of the evidence supports a finding

that Aguilar touched Doe 1's genitals over her clothes on at least two occasions, which makes him

subject to a 5-level increase for being a repeat-and-dangerous sex offender against minors under

U.S.S.G. § 4B1.5(b)(1).  Applying a base offense level of 12 pursuant to U.S.S.G. § 2A3.4(a)(3),

the uncontested 2-level increase for Doe 1 being in Aguilar's custody and control pursuant to

U.S.S.G. § 2A3.4(b)(3), a 5-level increase for Aguilar being a repeat-and-dangerous sex offender

against minors pursuant to U.S.S.G. § 4B1.5(b)(1) -- which requires an increase to 22 at a

minimum, subject to any decreases under U.S.S.G. § 3E1.1 -- and a 3-level decrease for Aguilar's

acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b),[5] Aguilar's offense

level is 19.  Aguilar's criminal history category is II.  See PSR ¶ 91, at 19.  With an offense level

of 19 and a criminal history category of II, Aguilar's imprisonment range is 33 to 41 months, which

is within the probation-to-48-months range that the Plea Agreement which the United States and

Aguilar executed under rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure provides.  See

Plea Agreement ¶ 11(a), at 5, filed November 16, 2022 (Doc. 63); Fed. R. Crim. P. 11(c)(1)(C).

---

[4]The Court additionally concludes that Aguilar did not commit his crime by use of fear and
intimidation, and, therefore, he is not subject to a base offense level of 16 under U.S.S.G. §
2A3.4(a)(2).

[5]As noted in note 1, supra, at 1, the United States does not object to applying a 2-level
decrease pursuant to U.S.S.G. § 3E1.1(a) and recommends an additional, 1-level decrease pursuant
to U.S.S.G. § 3E1.1(b), reflecting Aguilar's accepting responsibility for a crime with an offense
level above 16.  See Objections at 8.

## FACTUAL BACKGROUND

The Court's factual background is based on the facts that the Court finds by a preponderance of the evidence.  See United States v. Williams, No. CR. 17-2556 JB, 2020 WL 4016108, at *6 (D.N.M. July 16, 2020)(Browning, J.)(citing United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)).  Accord United States v. Zapata, 546 F.3d 1179, 1192 (10th Cir. 2008).  The Court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Banda, 168 F. App'x 284, 289 (10th Cir. 2006)(unpublished)("[T]here is no prohibition on considering hearsay testimony at sentencing, provided it bears indicia of reliability.").[6]  The evidence and information upon which the Court relies must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

---

[6]United States v. Banda is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Banda, United States v. Hendrickson, 592 F. App'x 699 (10th Cir. 2014), United States v. Schmidt, 353 F. App'x 132 (10th Cir. 2009), and United States v. Yazzie, No. 97-2201, 1998 WL 276362 (10th Cir. May 27, 1998), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

1.      In February, 2017, Doe 1 lived with her grandmother, two sisters, and three uncles -- Anthony, Jonathan, and Aguilar -- and the uncles' girlfriends.  See Transcript of February 14, 2017 Interview with Doe 1 at 10:25-11:4 (Doe 1, Forensic Interviewer), filed March 13, 2023 (Doc. 19)("Doe 1 Tr."); id. at 11:12-16 (Doe 1, Forensic Interviewer); Transcript of February 22, 2017 Interview with Jane Doe 2 at 10:6-11:6 (Doe 2, Forensic Interviewer), filed March 13, 2023 (Doc. 91)("Doe 2 Tr."); PSR ¶ 17, at 6.

2.      The incidents occurred at Doe 1's grandmother's home, which is on the San Felipe Pueblo Indian Reservation.  PSR ¶ 16, at 6.

3.      At the time the incidents occurred, Doe 1 was twelve years old.  See Doe 1 Tr. at 32:1-2 (Doe 1, Forensic Interviewer); PSR ¶¶ 16, 21, at 6.

4.      At the time the incidents occurred, Aguilar was thirty-four years old.  See PSR ¶ 21, at 6.

1.      **First Incident**.

5.      The first incident occurred on a Sunday, during a Dallas Cowboys football game, when Aguilar was drunk and trying to get Doe 1's attention, which caused Doe 1 to go to her room and lock the door.  See Doe 1 Tr. at 18:6-20 (Doe 1, Forensic Interviewer); PSR ¶ 13, at 5.

6.      As Doe 1 was about to take a nap, Aguilar unlocked the door to Doe 1's bedroom, got into her bed, pulled down the sheets, and touched Doe 1's thigh and vagina over her clothes.[7] See Doe 1 Tr. at 18:20-19:1 (Doe 1); id. at 25:14-19 (Doe 1, Forensic Interviewer); id. at 29:6-30:22 (Doe 1, Forensic Interviewer); id. at 31:1-32:1 (Doe 1, Forensic Interviewer); id. at 38:17-

_____

[7]During the February 14, 2017 interview, Doe 1 clarified that her use of the word "private" refers to "vagina."  Doe 1 1 Tr. at 25:3-9 (Doe, Forensic Interviewer); id. at 36:17-19 (Doe, Forensic Interviewer).

39:8 (Doe 1, Forensic Interviewer); PSR ¶¶ 13, at 5, 16, at 6.

7.     When Aguilar touched Doe 1's thigh and vagina, Doe 1 told Aguilar, "[m]y sisters are calling me," left the bedroom, and joined her sisters outside the house.  Doe 1 Tr. at 19:1-3 (Doe 1).  See id. at 30:22-25 (Doe 1).

8.     After Aguilar touched Doe 1's thigh and vagina, Doe 1 told her sisters to come inside and stay in her room with her.  See Doe 1 Tr. at 21:15-20 (Doe 1).

9.     Doe 1 told her sisters that Aguilar had touched her, and Doe 1's sisters said that they were scared to be around Aguilar.  See Doe 1 Tr. at 30:23-25 (Doe 1).

10.    Doe 1 and her sisters went to Doe 1's bedroom, locked the door, put a basket containing clothes by the door, and, when Aguilar tried to open the door, held the door shut, after which Aguilar left the house.  See Doe 1 Tr. at 21:21-22:3 (Doe 1).

**2.     Second Incident.**

11.    Roughly one week after the first incident, when Doe 1's friends were visiting, Aguilar was drunk and told Doe 1 to go into his room, to which Doe 1 said "no," and hid in a closet.  Doe 1 Tr. at 22:4-8 (Doe 1).

12.    Aguilar went into Doe 1's room, which Doe 1 said was locked, saw her in the closet, and told her to go to his room, to which Doe 1 again said "no."  Doe 1 Tr. at 22:9-12 (Doe 1).

13.    Aguilar left Doe 1's room, and Doe 1 hid on the side of the bed under blankets.  Doe 1 Tr. at 22:12-13 (Doe 1).

14.    Aguilar returned to Doe 1's room to look for her in the closet and under the covers, and, although Doe 1's friends told Aguilar that she was not there and had gone to the kitchen, Aguilar insisted that she was in the room.  See Doe 1 Tr. at 24:6-7 (Doe 1); 27:20-25 (Doe 1); Memorandum of Interview at 1-2 (dated February 22, 2017), filed February 9, 2023 (Doc. 79-

4)("February 22, 2017 MOI").

15.    At the time Aguilar returned to Doe 1's room, Doe 1's friends and sisters were on the bed where Doe 1 was hiding under the covers, and, at one point, Doe 1 told them to lie on top of her.  See Doe 1 Tr. at 24:4-13 (Doe 1); id. at 26:8-9 (Doe 1); id. at 26:19-27:19 (Doe 1, Forensic Interviewer); id. at 28:6-24 (Doe 1, Forensic Interviewer); Supplemental Report at 2; Memorandum of Interview at 1-2 (dated April 23, 2021), filed February 9, 2023 (Doc. 79-3)("April 23 MOI"); February 22, 2017 MOI at 1-3.

16.    When Doe 1's friends and sisters moved on the bed, Aguilar saw where Doe 1 was lying, touched Doe 1's vagina with his hand over the blanket, and tried pulling off the blanket onto which Doe 1 was holding.  See Doe 1 Tr. at 22:14-19 (Doe 1); id. at 24:4-13 (Doe 1); id. at 24:19-24 (Doe 1, Forensic Interviewer); id. at 26:2-4 (Doe 1); id. at 28:2-4 (Doe 1); id. at 28:25-29:5 (Doe 1, Forensic Interviewer); id. at 39:7-40:7 (Doe 1, Forensic Interviewer); PSR ¶ 14, at 6; April 23 MOI at 1-2; February 22, 2017 MOI at 1-3.

17.    When Aguilar was touching Doe 1 over the blanket, he told her to go to his room, and she said, "no," which made Aguilar angry and caused him to say "just come here."  Doe 1 Tr. at 22:16-19 (Doe 1).

18.    Doe 1 screamed after Aguilar touched her.  February 22, 2017 MOI at 1-2.

19.    As Aguilar tried to pull the blankets off Doe 1, an opening in the blankets emerged through which Aguilar touched Doe 1's vagina over her clothes.  Doe 1 Tr. at 26:6-8 (Doe 1); id. at 26:13-17 (Doe 1; Forensic Interviewer); id. at 39:7-40:7 (Doe 1, Forensic Interviewer); PSR ¶ 14, at 6.

20.    Aguilar touched Doe 1 over her clothes by wandering and searching with his hands "all over the place" in an attempt to touch her "private areas," and the touching lasted "for a while."

April 23 MOI at 2.

21.     When Aguilar touched Doe 1's vagina over her clothes, Doe 1 told Aguilar to stop, and started kicking him.  See Doe 1 Tr. at 26:8-10 (Doe 1); id. at 40:7 (Doe 1).

22.     Aguilar started laughing, told Doe 1 to go to his room, and left Doe 1's room.  See Doe 1 Tr. at 26:10-12.

23.     After Aguilar touched Doe 1 through the blanket, he returned to try to re-enter Doe 1's room, and Doe 1 and her friends proceeded to hold the door closed as Aguilar tried to unlock it, before returning to his own room.  See Doe 1 Tr. at 22:20-23:1 (Doe 1).

24.     Doe 1 wanted to tell another uncle, Anthony, about the second incident, but was scared to do so.  See Doe 1 Tr. at 23:6-14 (Doe 1, Forensic Interviewer).

25.     After the second incident, Doe 1 and at least one of her friends left the house through the bedroom window.  See April 23 MOI at 3.

**3.     Third Incident.**

26.     Another time, when Doe 1 was watching a movie in her uncle Anthony's room, Aguilar unlocked the door, laid down where Doe 1 was lying, got under the blankets, and tried to remove Doe 1's shirt and massage her, but Doe 1 stopped Aguilar.  See Doe 1 Tr. at 32:8-24 (Doe 1, Forensic Interviewer); id. at 33:14-34:12 (Doe 1, Forensic Interviewer); id. at 36:20-37:25 (Doe 1, Forensic Interviewer); PSR ¶ 15, at 6; Supplemental Report at 2.

27.     When Aguilar tried to touch Doe 1, Doe 1 told Aguilar, "[y]ou can't stay in here," and, at some point, Doe 1 left her uncle Anthony's room, and later told her sisters what happened. Doe 1 Tr. at 32:24-33:7 (Doe 1).

**4.     Doe 1 Reports the Incidents.**

28.     On February 12, 2017, Doe 1 left her family's house in the middle of the night and

did not return until the following morning, at the earliest.  See Doe 1 Tr. at 15:7-18 (Doe 1, Forensic Interviewer).  See PSR ¶ 12, at 5.

29.    On Doe 1's return, Doe 1's grandmother and one of her uncles scheduled an appointment for Doe 1 to visit a clinic, San Felipe Health Care Services in San Felipe Pueblo, "to see if anything happened" to Doe 1 during the night of her disappearance.  Doe 1 Tr. at 16:13-22 (Doe 1); PSR ¶ 12, at 5.

30.    During the appointment at San Felipe Health Care Services, when a medical professional asked Doe 1 if anybody touched her, Doe 1 replied that, "every time my uncle Kyle's drunk, he comes into my room.  He . . . lays in my bed and tries to touch me," which happened more than once in the past two weeks.  Doe 1 Tr. at 17:7-18 (Doe 1, Forensic Interviewer).  See Doe 1 Tr. at 35:11-16 (Doe 1, Forensic Interviewer); PSR ¶ 12, at 5.

31.    When asked how many times Aguilar laid in Doe 1's bed and tried to touch her, Doe 1 replied: "I think two or three times."  Doe 1 Tr. at 18:1-5 (Doe 1, Forensic Interviewer).  See PSR ¶ 12, at 5.

### 5.    Aguilar's Admission.

32.    In the Plea Agreement, Aguilar admits:

Sometime between October 2, 2016 and February 13, 2017, on San Felipe Pueblo in New Mexico, I touched a minor over her clothes over her genitals.  I was intoxicated and went into her bedroom.  The victim had obtained the age of 12, but had not yet attained the age of 16.  I am a member of the San Felipe Pueblo.

Plea Agreement ¶ 9, at 4.  See PSR ¶ 20, at 6.


### PROCEDURAL BACKGROUND

The Grand Jury indicted Aguilar on May 12, 2021, on two counts of Abusive Sexual Contact, in violation of 18 U.S.C. §§ 1153, 2244(a)(5), and 2246(3).  See Indictment, filed May 12, 2021 (Doc. 2).  The Indictment's two counts under those statutes correspond to two distinct incidents, for which the Grand Jury alleges:

> From on or about October 2, 2016, and continuing to on or about February 13, 2017, in Indian Country, in the District of New Mexico, the defendant, **KYLE AGUILAR**, an Indian, unlawfully and knowingly engaged in and caused sexual contact with Jane Doe, a child who had attained the age of twelve (12) years but had not attainted the age of sixteen (16) years, and the sexual contact consisted of the defendant intentionally touching Jane Doe's genitalia directly and through clothing, with the intent to abuse, humiliate, harass, degrade, arouse and gratify the sexual desire of any person.

Indictment at 1 (bold in original).  The Court issued a warrant for Aguilar's arrest on May 12, 2021.  See Arrest Warrant at 1, filed May 12, 2021 (Doc. 3).  Aguilar was arrested on May 18, 2021, see May 18, 2021, Docket Entry, filed May 18, 2021 (no document number)(text-only).

On November 16, 2022, the parties filed a Plea Agreement under rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, in which Aguilar pleads guilty to Count II, one of the Indictment's two counts for Abusive Sexual Contact under 18 U.S.C. §§ 1153, 2244(a)(5), and 2246(3).  See Plea Agreement ¶ 3, at 2.  In the Plea Agreement, Aguilar admits:

> Sometime between October 2, 2016 and February 13, 2017, on San Felipe Pueblo in New Mexico, I touched a minor over her clothes over her genitals.  I was intoxicated and went into her bedroom.  The victim had obtained the age of 12, but had not yet attained the age of 16.  I am a member of the San Felipe Pueblo.

Plea Agreement ¶ 9, at 4.  As the Plea Agreement states, Aguilar understands that the "maximum penalty provided by law" for the offense to which he pleads guilty is:

a.       imprisonment for a period of life imprisonment;

b.       a fine not to exceed the greater of $250,000 or twice the pecuniary gain to the Defendant or pecuniary loss to the victim;

     c.      a term of supervised release of not less than 5 years and up to a lifetime supervised release (if the Defendant serves a term of imprisonment, is then released on supervised release, and violates the conditions of supervised release, the Defendant's supervised release could be revoked -- even on the last day of the term -- and the Defendant could then be returned to another period of incarceration and a new term of supervised release.);

     d.      a mandatory special penalty assessment of $100.00; and

     e.      restitution as may be ordered by the Court.

Plea Agreement, ¶ 4, at 2.  In the Plea Agreement, Aguilar and the United States agree that

> the sentencing range for this matter will be probation up to 48 months of imprisonment as the appropriate disposition in this case . . . . The remaining components of the Defendant's sentence, including but not limited to any fine or restitution and the length and conditions of supervised release, shall be imposed by the Court after the presentation of evidence and/or argument by the parties.

Plea Agreement ¶ 11(a), at 5.  The United States and Aguilar agree that "as part of the Defendant[']s sentence, the Court will enter an order of restitution pursuant to the Mandatory Victim[']s Restitution Act, 18 U.S.C. § 3663A if appliable; if § 3663A is not applicable, the Court will enter an order of restitution pursuant to 18 U.S.C. §§ 3663 and 3664.  Plea Agreement ¶ 17, at 7.  Aguilar affirms his understanding that, by pleading guilty, he will be required to "register as a sex offender upon the Defendant[']s release from prison as a condition of supervised release pursuant to 18 U.S.C. § 3583(d)."  Plea Agreement ¶ 19, at 7.  In exchange for Aguilar's fulfillment of his obligations under the Plea Agreement, the United States agrees to move to dismiss Count I of the Indictment and to "not bring additional criminal charges against the Defendant arising out of the facts forming the basis of the present indictment."  Plea Agreement ¶ 25, at 9.

        The Honorable Laura Fashing, United States Magistrate Judge for the United States District Court for the District of New Mexico, held a plea colloquy during which Aguilar pled guilty as to Count II, one of the Indictment's two counts for Abusive Sexual Contact under 18 U.S.C. §§ 1153,

2244(a)(5), and 2246(3), and ordered that Aguilar's conditions of release would continue, on a finding that the "Defendant is not a flight risk or a danger to the community and . . . exceptional circumstances exist."  Plea Minute Sheet at 1, filed November 16, 2022 (Doc. 64).  See Transcript of November 16, 2022 Plea Hearing at 18:5-8 (Court, Aguilar), filed March 10, 2023 (Doc. 88)("November 16 Tr.").  During the plea colloquy, Aguilar admitted to touching a child between the age of twelve and sixteen "over her clothes over her genitals" at the San Felipe Pueblo, of which he is a member.  November 16 Tr. at 16:3-17:5 (Court, Aguilar).  The plea colloquy contains no admissions to use of force or threats.  See November 16 Tr. at 1:1-32:2 (Court, Aguilar, Marshall, Morris), filed March 10, 2023 (Doc. 88)("November 16 Tr.").  After the United States appealed Magistrate Judge Fashing's order that Aguilar's would not be detained, see United States' Appeal of Detention Order, filed November 30, 2022 (Doc. 66), the Court held a hearing and ordered Aguilar be returned to custody immediately, see Clerk's Minutes at 2, filed January 23, 2023 (Doc. 76).

The United States Probation Office ("USPO") filed the Presentence Investigation Report on January 24, 2023.  See PSR at 1-20.  In calculating Aguilar's offense level, the PSR applies a base offense level of 12, reasoning that "[t]he guideline for a violation of 18 U.S.C. § 1153 and 2244(a)(5) is U.S.S.G. §[]2A3.4.  The base offense level is 12.  U.S.S.G. 2A3.4(b)(3)."  PSR ¶ 26, at 7.  The PSR applies a 2-level increase, because of a specific offense characteristic, i.e., that the "victim was in the custody, care, or supervisory control of the defendant," pursuant to U.S.S.G. § 2A3.4(b)(3).  PSR ¶ 27, at 7.  The PSR applies a 2-level decrease to the base offense under U.S.S.G. § 3E1.1(a), on the basis that Aguilar "has clearly demonstrated acceptance of responsibility for the offense."  PSR ¶ 33, at 7.   Accordingly, the PSR sets a total offense level of 12.  See PSR ¶ 34, at 7.  On the basis of Aguilar's criminal record, the PSR calculates a criminal

history category of II.  See PSR ¶¶ 41-42, at 10.  Given that Aguilar's total offense level is 12 and

his criminal history category is II, the PSR states that the Guideline imprisonment range is 12 to

18 months, and that

> Since the applicable guideline range is in Zone C of the Sentencing Table, the
> minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence
> of imprisonment that includes a term of supervised release with a condition that
> substitutes community confinement or home detention according to the schedule in
> subsection (e), provided that at least one-half of the minimum term is satisfied by
> imprisonment.

PSR ¶ 76, at 16-17 (citing U.S.S.G. § 5C1.1(d)).  Regarding the impact of the Plea, the PSR states:

> The defendant entered a guilty plea as charged in the Indictment.  If the
> defendant were convicted at trial of all Counts of the Indictment his statutory
> penalties would not have changed.  The counts would not have grouped.  If the
> defendant were convicted at trial, his offense level would have been 16, absent any
> adjustments.  An offense level of 16 combined with a criminal history category of
> II results in a guideline imprisonment range of 24 months to 30 months.  The
> defendant reduced his exposure to incarceration by entering into the plea
> agreement.

PSR ¶ 77, at 17.  The PSR states that the statutory and Guideline provisions prescribe a term of

supervised release of five years to life.  See PSR ¶¶ 78-79, at 17 (citing 18 U.S.C. § 3583(k) and

U.S.S.G. § 5D1.2(b)(2)).  The PSR indicates that Aguilar is ineligible for probation because his

offense is a Class A Felony.  See PSR ¶¶ 80-81, at 17 (citing 18 U.S.C. § 3561(a)(1) and U.S.S.G.

§ 5B1.1(b)(1)).  The PSR states that the Court "may consider imposing Supervision conditions"

and directs the Court to Attachment A to the PSR (the Bruce Memorandum), which is the

memorandum prepared pursuant to the United States Court of Appeals for the Tenth Circuit's

opinion in United States v. Bruce, 458 F.3d 1157 (10th Cir. 2006).  PSR ¶ 82, at 17.  The PSR

contemplates the imposition of fines, and states that the fine range for Aguilar's offense is

$5,500.00 to $55,000.00.  See PSR ¶¶ 83-86, at 17-18.  The PSR states that 18 U.S.C. § 2259

requires restitution in this context.  See PSR ¶ 87, at 18.  The PSR identifies no factors warranting

a departure from the sentencing guideline range.  See PSR ¶ 90, at 18.  The PSR identifies the

following unique factors that relate to 18 U.S.C. 3553(a)(1)-(7):

- In the instant offense, the defendant knowingly engaged in and caused sexual contact with Jane Doe, who was 12 years old at the time of the offense.

- The victim is the defendant's minor niece, who was residing with the defendant and his family at the time of the offense.

- The defendant's criminal history includes convictions for the offenses of Driving While Intoxicated and Possession of Drug Paraphernalia.  In addition, the defendant possesses convictions for Aggravated Driving While Intoxicated, Resisting Arrest, Violation of Tribal Ordinance, Terroristic Threats, and Intoxication in the San Felipe Tribal Court in 2018.

- The defendant has four minor children and one adult child.  He currently pays child support for four of his children.

- The defendant possesses prosocial relationships with his girlfriend and family.

- The defendant is being treated for diagnoses of Alcohol Use Disorder, Moderate, and Cannabis Use Disorder, Mild at a New Awakening.

- Pretrial Services records indicate the defendant has multiple violations of his supervision including positive tests for alcohol and cannabis, as well as curfew violations.

PSR ¶ 91, at 19.  The PSR concludes:

> Based upon a total offense level of 12 and a criminal history category of II, the guideline imprisonment range is 12 months to 18 months.  Pursuant to written plea agreement and Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the government and the defendant agree a specific sentencing range of probation to 48 months imprisonment is appropriate disposition in the case.

PSR ¶ 91, at 19.

The United States has filed Objections to the PSR.  See Objections at 1-16.  The Objections

contend that the PSR provides the wrong offense level for Aguilar's crime, because it should:

(i) apply a base offense level of 20 under U.S.S.G. § 2A3.4(a)(1), because Aguilar's crime involves

aggravated sexual abuse by force or threat, or, in the alternative, apply a base offense level of 16 under U.S.S.G. § 2A3.4(a)(2) on the basis of the use of fear and intimidation; (ii) apply a corresponding 2-level increase under U.S.S.G. § 2A3.4(b)(2), because Aguilar's crime involves sexual abuse by force or threat against a minor between the ages of 12 and 16; and (iii) apply a 5-level increase for Aguilar being a repeat and dangerous sex offender against minors under U.S.S.G. § 4B1.5(b)(1).  See Objections at 7-16.  The Objections do not dispute the application of a 2-level increase pursuant to U.S.S.G. § 2A3.4(b)(3) for the victim being in Aguilar's custody and control. See Objections at 8.  The Objections do not dispute the application of a 2-level decrease pursuant to U.S.S.G. § 3E1.1(a) and recommend an additional, 1-level decrease under U.S.S.G. § 3E1.1(b), reflecting Aguilar's accepting responsibility for a crime with an offense level above 16.  See Objections at 8.  Given a base level of 20, level increases of 2, 2, and 5, and a level decrease of 3, the Objections request a total offense level of 26, which, when applied to a defendant with a criminal history category of II, prescribes an imprisonment range of 70 to 87 months.  See Objections at 8.

After the United States filed its Objections, Aguilar filed his Defendant's Sentencing Memorandum, filed February 14, 2023 (Doc. 81)("Aguilar Sentencing Memo.").  The Aguilar Sentencing Memo. asks the Court to: (i) accept the Plea Agreement; and (ii) impose a sentence of time served, with a period of supervised release.  See Aguilar Sentencing Memo. at 1.  In support of its proposed sentence, the Aguilar Sentencing Memo. introduces evidence of Aguilar's history and characteristics, including his familial relationships, educational and employment history, and alcohol addiction.  See Aguilar Sentencing Memo. at 1-5.  The Aguilar Sentencing Memo. asserts that "[t]here is no legitimate reason to speculate that Mr. Aguilar will present a risk of re-offense post-sentencing," and that "[a]lthough retribution or just punishment may suggest a period of

incarceration is appropriate, the other factors outweigh it, in favor of supervised release and home detention." Aguilar Sentencing Memo. at 6-7. Further, Aguilar contends that his having lived in San Felipe Pueblo, the same community as Doe 1, for years after he committed the crime, during which "there were no new allegations of inappropriate or unlawful conduct," is a "mitigating factor." Aguilar Sentencing Memo. at 7-8. Finally, Aguilar contends that the Court should take into account his need for treatment for alcohol abuse when arriving at a sentence. See Aguilar Sentencing Memo. at 8-10.

On February 27, 2023, the USPO filed an Addendum to the Presentence Report, filed February 27, 2023 (Doc. 84)("PSR Addendum"). The PSR Addendum addresses the Objections, but does not change the PSR's terms. See PSR Addendum at 2-4. The PSR Addendum states that the USPO applies the base offense level of 12 that U.S.S.G. § 2A3.4(a)(3) prescribes, because it "did not believe the defendant's actions, as described in discovery documents, contained the conduct described in 18 U.S.C. § 2241(a) and (b) and 18 U.S.C. § 2242." PSR Addendum at 2. In regard to 18 U.S.C. § 2241(a), the PSR Addendum notes that "the probation office has not noted any additional descriptions of force beyond the sexual act committed by the defendant," and it "has not located a description of the defendant physically holding the victim or using force to cause her to engage in the sexual acts." PSR Addendum at 2. Similarly, the USPO finds no evidence that, under 18 U.S.C. § 2241(b), Aguilar's crime involves "rendering the victim unconscious or by administering, without the permission of the victim, a drug or intoxicant that impairs the ability of the victim to appraise correct conduct." PSR Addendum at 3. Regarding the non-applicability of 18 U.S.C. § 2242, the PSR Addendum states:

> The government states the victim hid in the closet and under the bedcovers because she was in fear; however, no discovery documents clearly point to this being the reason the victim hid. The probation office did not observe a statement

by the victim in the discovery documents in which the victim states she was in fear of the defendant. The government notes "Jane Doe did this out fear [sic] since defendant sexually abused her in the past in a similar fashion." (Doc 79). The probation office has not noted any such statement from the victim in discovery testifying to this information. Discovery documents do not include a statement by the victim that she physically resisted the defendant or told him to stop. The probation office notes the actions of hiding in the close and under the bedcovers are not specifically described in discovery as actions meant to prevent the defendant's actions.

PSR Addendum at 3 (alteration in original). The PSR Addendum notes that, in the Plea Agreement, Aguilar does not admit specifically to the application of force or fear in connection with his crime. See PSR Addendum at 3. Finally, regarding U.S.S.G. § 4B1.5(b)(1)'s non-applicability, the PSR Addendum explains:

USSG § 4B1.5(b)(1) was not applied because available discovery and the statements provided by the defendant and victim do not confirm the dates of the separate charged sexual acts. The probation office acknowledges the separate act does not need to be charged or listed in an offense of conviction. The victim's statements included descriptions of multiple incidents involving the defendant touching her in a sexual manner and she advised these incidents occurred on separate occasions; however, the probation office did not apply this enhancement because the separate incident occasions were not clearly defined in available discovery.

PSR Addendum at 4.

A few weeks later, Aguilar filed his Response to the Government's Objections to the Presentence Report, filed March 2, 2023 (Doc. 85)("Response"). Aguilar contends that he cannot be subject to a base offense level of 20 under U.S.S.G. § 2A3.4(a)(1), because he has not admitted using force or threat against the victim, and force or threat are not elements of Count II, to which he pled guilty. Response at 1-2. Aguilar emphasizes that "the government had Mr. Aguilar admit only that he touched the minor's genitals over her clothes and that she was over the age of 12 but less than 16 . . . . If the government believed the use of force or threat were elements of the offense, it could have included those elements in its presentation to the grand jury and then made them a

part of the plea agreement."  Response at 2-3.  Aguilar maintains that "the government is bound by the agreement's unequivocal language: the use of force or threat are not elements of the offense, nor facts to which Mr. Aguilar was expected to admit by the agreement's terms."  Response at 3. Further, Aguilar asserts that "[t]he government's insistence that Mr. Aguilar 'intrinsically' admitted to [the use of force or threats] and should be corresponding punished for that admission, is a violation of the plea agreement's express terms and the parties' understanding of the offense elements and factual basis."  Response at 3-4.  Aguilar maintains that the use of force or threats are not part of the Plea Agreement's factual basis.  See Response at 4.  Further, Aguilar contends that the "parties' understanding of the offense elements and factual basis is upended by the government's post hoc allegation that Mr. Aguilar admitted to elements and facts that were not part of the plea agreement."  Response at 5.  Finally, Aguilar contends that the Court should apply a heightened evidentiary standard when assessing Guideline enhancements that that have "a disproportionate impact on the recommended prison range of the offense of conviction."  Response at 7.  Aguilar alleges that, when "at least half of the calculated imprisonment range derives from the court finding an uncharged offense, a higher level of procedural protection is a commensurate expectation," and that the "clear and convincing standard ensures greater certainty in a court's factual conclusions, which befits the loss of more liberty than authorized by either admissions or jury verdict."  Response at 8.  Aguilar cites United States Court of Appeals for the Ninth Circuit case law in support of his argument that the clear-and-convincing standard should apply.  See Response at 9 (citing United States v. Hymas, 780 F.3d 1285, 1290 (9th Cir. 2015)).

After Aguilar filed his Response, the United States filed its Sealed Reply to Defendant's Response to United States' Sealed Objections to the PSR, filed March 10, 2023 (Doc. 89) ("Reply"), as well as additional evidence in the form of transcripts of recordings of forensic

interviews with the victim, see Doe 1 Tr. at 1:1-47:3 (Doe 1, Forensic Interviewer), and her sister,

see Doe 2 Tr. at 1:1-28:18 (Doe 2, Forensic Interviewer).  In the Reply, the United States re-states

its arguments that U.S.S.G. § 2A3.4(a)(1) should set a base offense level of 20 in this case, because

Aguilar's crime involves the use of force, and that 5-level increase should apply under U.S.S.G. §

4B1.5(b)(1) because Aguilar is a repeat and dangerous sex offender against minors.  See Reply at

1.  The Reply first argues that use of force "is inherent to the crime which Defendant admitted

guilt to as part of the plea," i.e., Abusive Sexual Contact of a Minor in Indian Country under 18

U.S.C. §§ 1153, 2244(a)(5), and 2246(3), and directs the Court to United States v. Platero, 996

F.3d 1060, 1061-64 (10th Cir. 2021), for an explanation of the interactions between the statutes at

issue in this case, and United States v. Holly, 488 F.3d 1298, 1302 (10th Cir. 2007), to support the

contention that Aguilar's crime involved the use of force as a matter of law.  Reply at 3.  The

United States contends further:

> In order to start at USSG § 2A3.4(A)(3) as currently recommended in the PSR,
> Defendant would have needed to plea to a different subsection of the statute, such
> as 18 U.S.C. § 2244(a)(3), that does not include force as part of the crime itself.
> However, Defendant pleaded guilty to a crime under 2244(a)(5) and force is
> intrinsic to that crime.  Therefore, USSG § 2A3.4(a)(1) must be applied.

Reply at 4.  The Reply next turns to factual allegations that Aguilar used force in committing his

crime, and cites extensively to the Doe 1 Tr. and Doe 2 Tr., with specific reference to facts not in

the PSR indicating the victim's hiding, physical resistance, and telling Aguilar to stop.  See Reply

at 5-7.  The Reply proceeds to assert that the repeat-and-dangerous-sex-offender-against-minors

enhancement under U.S.S.G. § 4B1.5(b)(1) should apply.  See Reply at 7-10.  First, the Reply

attacks Aguilar's argument that a higher standard than preponderance of the evidence should apply

in this context and contends that the United States Court of Appeals for the Tenth Circuit rejects

the Ninth Circuit approach that Aguilar argues is appropriate.  See Reply at 8.  Turning to the facts,

the Reply states that the PSR and PSR Addendum indicate that Aguilar abused the victim on more than one occasion.  See Reply at 9.  Regarding the "clear separation in time between the incidents," the Reply states that one incident "occurred when Jane Done refers to the Cowboys football game going on, and no one else was in the home as compared to the second one in Jane Doe's room, with other witnesses."  Reply at 9.  The Reply cites further to the record and particularly to the Doe 1 Tr. to support the assertion that Aguilar abused the victim on more than one occasion.  See Reply at 9-11.

On March 23, 2023, Aguilar filed his Supplement to Sentencing Memorandum, filed March 23, 2023 (Doc. 93)("Supplement").  In the Supplement, Aguilar presents evidence of his character, including his service as a Tribal Office in the San Felipe Pueblo, his abstention from alcohol starting on February 8, 2020, his educational attainment, and his familial relationships.  See Supplement at 2.  The Supplement requests a sentence of time served and probation.  See Supplement at 3.

On March 24, 2023, the United States filed a Sentencing Memorandum.  See United States' Sealed Sentencing Memorandum, filed March 24, 2023 (Doc. 94)("U.S. Sentencing Memo.").  The United States requests that the Court impose a sentence of 48 months on Aguilar, and a term of 10 years of supervised release.  See U.S. Sentencing Memo. at 8.  Speaking to the offense's nature, circumstance, and seriousness, the United States emphasizes:

> Defendant would . . . prey on his niece when he was intoxicated.  12-year old Jane Doe fought back to the best of her ability by locking doors, hiding, and screamed when Defendant would come and sexually molest her.  Defendant used his size and position of power and authority to touch Jane Doe's genitalia.  He did this without regard for Jane Doe's bodily integrity and for the incident he pleaded guilty, he did it in front of other minor females.  Jane Doe did everything a 12 year-old girl could do to protect hself [sic] when being sexually abused, but locked doors and witnesses would not prevent Defendant from abusing her.

U.S. Sentencing Memo. at 9.   The U.S. Sentencing Memo. emphasizes the harm that Doe 1 suffered as a result of Aguilar's crime and the need for deterrence.   See U.S. Sentencing Memo. at 9-10.   Further, the U.S. Sentencing Memo. contends that Aguilar presents a recidivism risk, because he is a repeat offender and violated repeatedly his supervised release terms.   See U.S. Sentencing Memo. at 10-11.   Finally, the United States looks to Aguilar's criminal history as an indication that the Court should not be lenient in sentencing him.   See U.S. Sentencing Memo. at 12-13.

## LAW REGARDING THE SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory.   In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.   Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."   United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and

> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551. To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"). They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and ']represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'" United States v. Cage, 451 F.3d at 593 (quoting United

States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).  A reasonable sentence is one that also

"avoid[s] unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at

261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within

the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d

1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S.

at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251, n.3 (10th Cir.

2008).  This presumption, however, is an appellate presumption, and not one that the trial court

can or should apply.  See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United

States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351.  Instead, the trial court

must undertake the § 3553(a) balancing of factors without any presumption in favor of the

advisory[8] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States,

552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

---

[8]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range).  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-Guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward

---

Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).
>
> . . . .
>
> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.) (emphasis in original).

departures.  The sentencing court may, however, also use these same departure
factors in the <u>Booker</u> calculus, even if the court does not grant a downward
departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. February

13, 2008)(Browning, J.).  The Supreme Court has recognized, however, that sentencing judges are

"in a superior position to find facts and judge their import under § 3553(a) in each particular case."

<u>Kimbrough v. United States</u>, 552 U.S. at 89.   Applying § 3553(a)'s factors, the Court has

concluded that the case of an illegal immigrant who re-entered the United States to provide for his

two children and two siblings was not materially different from other re-entry cases, and, thus, no

variance from the Guidelines sentence was warranted.  <u>See</u> <u>United States v. Almendares-Soto</u>, No.

CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. December 14, 2010)(Browning, J.).  On the

other hand, in <u>United States v. Jager</u>, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. February

17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual

degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate,

because the defendant's military service was "superior and uniformly outstanding," as the

defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."

2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court reaffirmed the

principle that it is permissible for sentencing judges "to exercise discretion -- taking into

consideration various factors relating both to offense and offender -- in imposing judgment *within*

*the range* prescribed by statute."  530 U.S. at 481 (emphasis in original).  The Supreme Court

cautioned, however, that the Constitution of the United States of America limits this discretion and

that the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(citing Ring v. Arizona, 536 U.S. 584, 602 (2002); Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2012)).  In United States v. Booker, however, the Supreme Court held that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. at 259).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement."  (second alteration added by United States v. Booker)(quoting United States v. Booker, 543 U.S. at 221).  More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  See Alleyne v. United States, 570 U.S. at 103.

    In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005)(McConnell, J.), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.

United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine.  See United States v. Magallanez, 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on government witnesses' testimony of the various amounts that they had sold to the defendant -- attributed 1,200 grams of methamphetamine to the defendant and used that amount to calculate his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's 50 grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount.  See United States v. Magallanez, 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before," United States v. Magallanez, 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United States v. Olsen, 519 F.3d at 1105 (quoting United States v. Washington, 11 F.3d 1510, 1516 (10th

Cir. 1993)).[9]  "[T]he application of an enhancement . . . does not implicate the Supreme Court's

holding in *Apprendi v. New Jersey*."  United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012

WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.).  The Tenth Circuit applies Apprendi

v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase

a defendant's sentence "above the statutory maximum permitted by the statute of conviction."

United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005).  Accord United States v. Ray, 704 F.3d

at 1314.  A defendant may assert an error under Apprendi v. New Jersey only where the fact at

---

[9]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation).  See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (concluding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).  Subsequent to United States v. Washington, the Tenth Circuit reiterated the position that preponderance of the evidence is the proper standard, stating: "The Supreme Court has not adopted a heightened standard of proof at sentencing for contested facts, thus we hold that the correct standard of proof in this case was a preponderance of the evidence. This issue has been foreclosed in this Circuit."  United States v. Robertson, 946 F.3d 1168, 1171 (10th Cir. 2020)(citing United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)).

issue increased his sentence beyond the statutory maximum.  See United States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished)(holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence"). The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v. United States . . . expands the rule from Apprendi v. New Jersey, . . . (holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence.  See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. August 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.).  The Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.' . . . And under our Constitution, when 'a finding of fact alters the legally prescribed punishment so as to aggravate it,' that finding must be made by a jury of the defendant's peers beyond a reasonable doubt."  United States v. Haymond, 139 S. Ct. 2369, 2378 (2019)(quoting Alleyne v. United States, 570 U.S. at 112-14).  Further, the Tenth Circuit has determined that a district court could use its own finding on drug quantity to enhance a defendant's Guidelines range consistent with Alleyne v. United States, "so long as the court does not use its own drug quantity finding to alter the defendant's *statutory* sentencing range."  United States v. Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

**LAW REGARDING RELEVANT CONDUCT FOR SENTENCING**

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, n.1(I). In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America notes:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction. That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis, alterations, and first ellipsis in original)(quoting 18 U.S.C. § 1951(a)). The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

(1)

    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

    (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)    solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The Guidelines "allow courts to consider conduct which is not formally charged or is not an element of the offense of conviction." United States v. Tagore, 158 F.3d 1124, 1128 (10th Cir. 1998). Conduct is relevant when it is "the same type of conduct" or part of "the same scheme or plan" as the conviction offenses. United States v. Custodio, 39 F.3d 1121, 1126 (10th Cir. 1994). The conduct that a sentencing court may consider, therefore, "comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct." United States v. Allen, 488 F.3d 1244, 1254-55 (10th Cir. 2007). "Section 1B1.3 embodies the principle that the sentence should reflect the offense's seriousness, and so courts should consider all conduct relevant to determining that seriousness." United States v. Nissen, 492 F. Supp. 3d 1254, 1272 (D.N.M. 2020)(Browning, J.)(citing United States v. Allen, 488 F.3d at 1255).

Pursuant to U.S.S.G. § 6A1.3's commentary, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. See U.S.S.G. § 6A1.3 cmt. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning, J.), aff'd, 523 F.3d 1258 (10th Cir. 2008). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual

finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997). In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge. See 515 U.S. at 404-06. The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991. See 515 U.S. at 392-93. In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics. See Witte v. United States, 515 U.S. at 392-93. At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and thus calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes. See Witte v. United States, 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with his activities in 1990. See Witte v. United States, 515 U.S. at 392-93. The defendant moved to dismiss the indictment, contending that he had already been punished for the cocaine offenses, because the court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense. See Witte v. United States, 515 U.S. at

- 31 -

395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  See Witte v. United States, 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals opinions, including a United States Court of Appeals for the Tenth Circuit opinion, that had previously considered this question.  See United States v. Witte, 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit decision.  See United States v. Witte, 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  United States v. Witte, 515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  United States v. Witte, 515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the

authorized range if it was either accompanied by or preceded by additional criminal activity." United States v. Witte, 515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted. See United States v. Watts, 519 U.S. at 149. The Supreme Court noted that its conclusion was in accord with every United States Court of Appeals other than the Ninth Circuit, and that each Court of Appeals previously had held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence. See United States v. Watts, 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court began its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661). According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit caselaw adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts. See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause). In United States v. Banda, 168 F. App'x at 284, the Tenth Circuit rejected a defendant's argument that it was "structural error"

for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard." 168 F. App'x at 290. The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'" United States v. Banda, 168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant appealed the district court's sentence enhancement for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime. See 947 F.2d at 1428. The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges. See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(Green, J.)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")). Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing the defendant's sentence for possession of a firearm. See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were

- 34 -

handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit summarized that, in reviewing relevant federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d at 1510, the defendant argued that the United States needed to prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison.  See 11 F.3d at 1515.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  United States v. Washington, 11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).  See United States v. Sangiovanni, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. August 29, 2014)(concluding that a sentencing court can cross-reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1319 (D.N.M. 2014)

(Browning, J.)(cross-referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court has held previously that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal.  See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. February 13, 2012) (Browning, J.).  The Court also has held that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence.  See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.).  Finally, the Court has held that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence.  United States v. Romero, No. CR 09-1253 JB, 2012 WL 6632493, at *23 (D.N.M. December 6, 2012)(Browning, J.).  See United States v. Tapia, No. CR 12-3012 JB, 2017 WL 6417610, at *10-15 (D.N.M. December 14, 2017)(Browning, J.).

## ANALYSIS

Given the United States' objection to the PSR, the Court must determine whether Aguilar's crime warrants a harsher sentence under the Guidelines than the range that the PSR provides.  The Court has reviewed the factual record, statutes at issue, and relevant case law.  The Court concludes that: (i) a preponderance of the evidence does not support a finding that Aguilar committed his crime by force or threats under U.S.S.G. § 2A3.4(a)(1), and, accordingly, a base offense level of

12 applies under U.S.S.G. § 2A3.4(a)(3)[10]; (ii) because Aguilar is subject to a base offense level of 12 under U.S.S.G. § 2A3.4(a)(3), he is not subject to a 2-level increase under U.S.S.G. § 2A3.4(b)(2); and (iii) a preponderance of the evidence supports a finding that Aguilar touched Doe 1's genitals over her clothes on at least two occasions, which makes him subject to a 5-level increase for being a repeat-and-dangerous sex offender against minors under U.S.S.G. § 4B1.5(b)(1).

## I.   AGUILAR IS SUBJECT TO A BASE OFFENSE LEVEL OF 12 UNDER U.S.S.G. § 2A3.4(a)(3), BECAUSE THERE IS INSUFFICIENT EVIDENCE THAT HE USED FORCE OR THREATS, OR FEAR OR INTIMIDATION, IN COMMITTING HIS CRIME.

The Court overrules the United States' Objection that Aguilar should be subject to a base offense level of 20, because a preponderance of the evidence does not support a finding that Aguilar's crime involved the use of force or threats.[11]  See U.S.S.G. § 2A3.4(a)(1).  For U.S.S.G. § 2A3.4(a)(1) to apply, the Guidelines indicate that Aguilar's crime must involve

> [e]ngaging in, or causing sexual contact with, or by another person by: (A) using force against the victim; (B) threatening or placing the victim in fear that any person will be subjected to death, serious bodily injury, or kidnapping; (C) rendering the victim unconscious; or (D) administering by force or threat of force, or without the knowledge or permission of the victim, a drug, intoxicant, or other similar substance and thereby substantially impairing the ability of the victim to appraise or control conduct.

---

[10]The Court additionally concludes that Aguilar did not commit his crime by use of fear and intimidation, and, therefore, he is not subject to a base offense level of 16 under U.S.S.G. § 2A3.4(a)(2).

[11]As noted below, the Court also overrules the United States' alternative Objection that that Aguilar should be subject to a base offense level of 16 for use of fear or intimidation under U.S.S.G. § 2A3.4(a)(2).  In analyzing whether Aguilar is subject to a base offense level of 16 for having used fear or intimidation under U.S.S.G. § 2A3.4(a)(2), it must determine whether Aguilar acted by "threatening or placing the victim in fear (other than by threatening or placing the victim in fear that any person will be subjected to death, serious bodily injury, or kidnapping)."  U.S.S.G. § 2A3.4, cmt. n. 3.

U.S.S.G. § 2A3.4, cmt. n.2.  There is no evidence in the record, nor does the United States allege, that Aguilar's crime involved rendering the victim unconscious or administering a drug or intoxicant.  Accordingly, the relevant inquiry is whether Aguilar acted by (i) "using force against" Doe 1; or (ii) "threatening or placing [Doe 1] in fear that any person will be subjected to death, serious bodily injury, or kidnapping."  U.S.S.G. § 2A3.4 cmt. n.2.

Before analyzing the facts, however, the Court must address the United States' argument that, by pleading guilty to Count II, Aguilar has admitted that he used force or threats, because those are among his crime's elements.  See Objections at 10-11.  The United States argues:

> The conduct and force used in touching the minor meet the elements of the crime to qualify for 18 U.S.C. § 2244(a)(5), so intrinsically that means the force used was sufficient for 18 U.S.C. § 2241(a)(1) . . . .  To agree with the PSR would mean that the conduct was insufficient to meet an element of the crime and would seem to require the Court to reject the plea agreement as insufficiently meeting the required elements to the crime.  Either Defendant committed the conduct required, and admitted to such as part of the plea, or an element of the crime was not proven, and we have an issue with the plea agreement.

Objections at 10-11.  Indeed, the Plea Agreement purports to list the elements of the crime to which Aguilar pled, but omits the force or threat elements under 18 U.S.C. § 2241(a).[12]  See Plea Agreement ¶ 8, at 3.  The only elements for Abusive Sexual Contact of a Minor in Indian Country under 18 U.S.C. §§ 1153, 2244(A)(5), and 2246(3) that the Plea Agreement lists are:

*First:*   Defendant knowingly engaged in or caused sexual contact;

*Second:*   The minor victim had attained the age of twelve years, but had not attained the age of sixteen years, and offender is at least four years older;

---

[12]As the United States notes, see Objections at 9-10, the elements of the crime to which Aguilar pled are spread across multiple statutes, including 18 U.S.C. § 2244(a)(5), which refers to violations of 18 U.S.C. § 2241(c), which in turn refers to 18 U.S.C. §§ 2241(a) and 2241(b), the former containing the force or threat elements now at issue.  See United States v. Platero, 996 F.3d 1060, 1061-64 (10th Cir. 2021)(discussing interactions of statutes related to 18 U.S.C. § 2244).

|          |                                                        |
|----------|--------------------------------------------------------|
| *Third:* | Defendant is Indian, as federally defined;            |
| *Fourth:* | The sexual contact occurred in Indian country, as federally defined. |

Plea Agreement ¶ 8, at 3 (italics in original).  There is no reference here to the use of force or threats.  Further, Aguilar's admission under the Plea Agreement contains no reference to force or threats:

> Sometime between October 2, 2016 and February 13, 2017, on San Felipe Pueblo in New Mexico, I touched a minor over her clothes over her genitals.  I was intoxicated and went into her bedroom.  The victim had obtained the age of 12, but had not yet attained the age of 16.  I am a member of the San Felipe Pueblo.

Plea Agreement ¶ 9, at 4.  Similarly, Aguilar's plea colloquy with Magistrate Judge Fashing contains no admissions to use of force or threats.  See November 16 Tr. at 1:1-32:2 (Court, Aguilar, Marshall, Morris).  Given these omissions, in preparation for sentencing, the Court entered a Minute Order, filed March 27, 2023 (Doc. 96)(text-only):

> In preparation for the March 28, 2023, Sentencing Hearing, see Amended Notice of Hearing, filed March 27, 2023 (Doc. 95)(text-only), the Court has considered the parties' written arguments regarding the United States' Sealed Objections to the PSR, filed February 9, 2023 (Doc. 79)("Objections").  The Court also has reviewed the Plea Agreement, filed November 16, 2022 (Doc. 63), and the statutes under which Defendant Kyle Aguilar pled guilty to Count II, Abusive Sexual Contact of a Minor in Indian Country, see 18 U.S.C. §§ 1153, 2244(a)(5), 2246(3).  One of those statutes, 18 U.S.C. § 2244(a)(5), refers to violations of 18 U.S.C. § 2241(c).  The relevant provision of 18 U.S.C. § 2241(c), that involving a victim between twelve and sixteen years of age who is at least four years younger than the defendant, refers to the conduct described in 18 U.S.C. §§ 2241(a) and 2241(b).  See, e.g., Eleventh Circuit Judicial Council Committee on Pattern Jury Instructions, ELEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS, CRIMINAL CASES O79.4 at 1 (2016 revision)(incorporating force and threat elements into 18 U.S.C. § 2241(c) for crimes involving victims between the ages of twelve and sixteen).  Although the Plea Agreement lists some elements of the offense to which Aguilar pled, it does not list the elements included in 18 U.S.C. §§ 2241(a) and 2241(b).  Among these missing elements are the use of force or threat under 18 U.S.C. § 2241(a), or the conduct described in 18 U.S.C. § 2241(b).  Do the parties need to amend the Plea Agreement to include all of the elements of

the crime to which Aguilar pled and have another plea colloquy with the Magistrate Judge?

Minute Order at 1.  Because the Court concludes that, although Aguilar pled guilty to Count II, he did not admit to its elements of force or threat, the Court must look to the record to determine whether Aguilar's crime involved the use of force or threat for purposes of applying the heightened base offense level that U.S.S.G. § 2A3.4(a)(1) prescribes.

Although "there is no statutory definition of 'force' provided by the Guidelines," the Tenth Circuit has held "that the § 2A3.1(b)(1) enhancement is justified by the factual finding that the perpetrator used 'such physical force as is sufficient to overcome, restrain or injure a person; or the use of a threat of harm sufficient to coerce or compel submission by the victim.'"  United States v. Reyes Pena, 216 F.3d 1204, 1211 (10th Cir. 2000)(quoting United States v. Yazzie, No. 97-2201, 1998 WL 276362, at *3 (10th Cir. May 27, 1998)).  In addition, "force may be inferred by such facts as disparity in size between victim and assailant, or disparity in coercive power, such as that between an adult and a child."  United States v. Reyes Pena, 216 F.3d at 1211.  See United States v. Knight, 116 F. Supp. 3d 439, 444 (M.D. Pa. 2015)(Conner, J.)("Force within the margins of the § 2A3.1(b)(1) enhancement is that force sufficient to restrain a victim, overcome a victim, or prohibit a victim from escaping, and it follows that the amount of vigor needed to accomplish those objectives will necessarily vary from one person to another.")(quoting United States v. Reyes Pena, 216 F.3d at 1211).  For instance, in United States v. Reyes Pena, the Tenth Circuit affirmed the district court's conclusion that the defendant, who was in his late twenties and was much larger than his ten-year-old victim, used force where he grabbed the victim by the arm when she tried to escape, made her lay next to him on the bed, and would push her against the wall when she tried to kick and push him away.  See 216 F.3d at 1207.  Similarly, the Tenth Circuit affirmed a district

court's conclusion that the defendant used force where the defendant "grabbed the victim by both shoulders when she tried to get away, and forced her to lay on the bed. [The defendant] held the victim down against her will and the victim was unable to get him off of her." United States v. Pewenofkit, 173 F.3d 865, 868 (10th Cir. 1999).

In the absence of an admission by Aguilar that he used force or threats in connection with his crime, the Court does not find sufficient evidence in the record to prove that Aguilar should be subject to the U.S.S.G. § 2A3.4(A)(1) base level of 20. The Court notes that there is a disparity in size and coercive power between Doe 1, a twelve-year old girl, and Aguilar, her thirty-four year old uncle who lives in the same house, from which force can be inferred. See United States v. Reyes Pena, 216 F.3d at 1211. A disparity in size, age, or authority, however, is not enough, in and of itself, to prove the application of force. See, e.g., United States v. Cheresposy, 552 F. Supp. 3d 1209, 1214 (D.N.M. 2021)(Browning, J.)("Here, although force can be inferred from disparity in size, [the defendant] did not use force, because he did not '"restrain"' either victim when he touched them, he did not use a weapon or threaten them with a weapon, and the physical contact was not 'sufficient that the other person could not escape the sexual contact.'"). There is evidence of three distinct incidents in which Aguilar touched Doe 1. The Court analyzes each of the three incidents individually to determine whether Aguilar used force in connection with his crime. The Court notes that, although Aguilar only pled to one count of Abusive Sexual Contact of a Minor in Indian Country, see Plea Agreement ¶ 3, at 2, the Court may take into account Aguilar's relevant conduct in the form of other instances of touching Doe 1. See U.S.S.G. § 1B1.1, n.1(I); U.S.S.G § 1B1.3(a)(1)-(4). See also United States v. Tagore, 158 F.3d at 1128; United States v. Custodio, 39 F.3d 1121, 1126 (10th Cir. 1994).

The first incident took place in Doe 1's bedroom on a Sunday, during a Dallas Cowboys football game, when Aguilar was drunk and trying to get Doe 1's attention, which caused Doe 1 to go to her room and lock the door.  See Doe 1 Tr. at 18:-6-20 (Doe 1, Forensic Interviewer); PSR ¶ 13, at 5.  Aguilar unlocked the door to Doe 1's bedroom, got into her bed, pulled down the sheets, and touched Doe 1's thigh and vagina over her clothes.  See Doe 1 Tr. at 18:20-19:1 (Doe 1); id. at 25:14-19 (Doe 1, Forensic Interviewer); id. at 29:6-30:22 (Doe 1, Forensic Interviewer); id. at 31:1-32:1 (Doe 1, Forensic Interviewer); id. at 38:17-39:8 (Doe 1, Forensic Interviewer).  The evidence is that Doe 1 told Aguilar that her sisters were calling her, left the bedroom, and joined her sisters outside the house, see Doe 1 Tr. at 19:1-3 (Doe 1); id. at 30:22-25 (Doe 1); the record does not indicate that, during the first incident, Aguilar used "'such physical force as is sufficient to overcome, restrain or injure a person; or that the use of a threat of harm sufficient to coerce or compel submission by the victim.'"  United States v. Reyes Pena, 216 F.3d at 1211 (quoting United States v. Yazzie, 1998 WL 276362, at *3).  To the contrary, the record reflects that Doe 1 was able to get up and leave the room shortly after Aguilar began touching her.  See Doe 1 Tr. at 18:20-19:1 (Doe 1); id. at 25:14-19 (Doe 1, Forensic Interviewer); id. at 29:6-30:22 (Doe 1, Forensic Interviewer); id. at 31:1-32:1 (Doe 1, Forensic Interviewer); id. at 38:17-39:8 (Doe 1, Forensic Interviewer).  After the incident, once Doe 1's sisters joined her in her room, Aguilar returned and tried to open the door, which Doe 1 and her sisters were holding shut, and, unable to open the door, Aguilar left the house.  See Doe 1 Tr. at 21:21-22:3 (Doe 1).  The Court concludes that the evidence that Aguilar used force in connection with the first incident is insufficient to implicate U.S.S.G. § 2A3.4(a)(1).

The second incident took place a week after the first touching, when Aguilar was drunk, and Doe 1's friends were visiting.  See Doe 1 Tr. at 22:4-6 (Doe 1).  After Aguilar told Doe 1 to

go to his room, she said "no" and hid in her bedroom closet.  See Doe 1 Tr. at 22:7-8 (Doe 1).

Aguilar then left the room but returned to look for Doe 1 after she had hidden under blankets on

the side of the bed.  See Doe 1 Tr. at 22:12-13 (Doe 1); id. at 24:6-7 (Doe 1); id. at 27:20-25 (Doe

1); February 22, 2017 MOI at 1-2.  Doe 1's friends and sisters were on the bed where Doe 1 was

hiding, and, at one point, Doe 1 told them to lie on top of her.  See Doe 1 Tr. at 24:4-13 (Doe 1);

id. at 26:8-9 (Doe 1); id. at 26:19-27:19 (Doe 1, Forensic Interviewer); id. at 28:6-24 (Doe 1,

Forensic Interviewer); Supplemental Report at 2; April 23 MOI at 1-2; February 22, 2017 MOI at

1-3.  When Doe 1's friends and sisters moved on the bed, Aguilar saw where Doe 1 was lying,

touched Doe 1's vagina with his hand through the blanket, and tried pulling off the blanket, which

Doe 1 was holding.  See Doe 1 Tr. at 22:14-19 (Doe 1); id. at 24:4-13 (Doe 1); id. at 24:19-24

(Doe 1, Forensic Interviewer); id. at 26:2-4 (Doe 1); id. at 28:2-4 (Doe 1); id. at 28:25-29:5 (Doe

1, Forensic Interviewer); id. at 39:8-40:7 (Doe 1, Forensic Interviewer); PSR ¶ 14, at 6; April 23

MOI at 1-2; February 22, 2017 MOI at 1-3.  Although attempting to pull off a blanket and touching

Doe 1's genitals through the blanket are both physical acts, they do not approach the use of force

sufficient to "overcome, restrain, or injure" a victim.  United States v. Reyes Pena, 216 F.3d at

1211.  That Aguilar touched Doe 1 over her clothes by wandering and searching with his hands

"all over the place" in an attempt to touch her "private areas," and that the touching lasted "for a

while," April 23 MOI at 2, do not suggest that Aguilar physically restrained Doe 1 in a way that

constitutes the use of force.  See United States v. Cherespoy, 552 F. Supp. at 1214 (finding that

a defendant did not use force when he "abused . . . victims for twenty to thirty seconds by touching

them under their clothes" and touched their genitals, but did not "grab[] them, h[o]ld them in place,

push[] them onto the bed, or otherwise physically restrain them").  Doe 1's telling Aguilar to stop,

and kicking him when he did not, see Doe 1 Tr. at 26:9-10 (Doe 1); id. at 39:7-40:7 (Doe, Forensic

Interviewer), indicates Doe 1's attempt to stop the abuse, but does not suggest that Aguilar used force, particularly given that he then left the room, see February 22, 2017 MOI at 1-2.  As in the first incident, Aguilar returned, and Doe 1 and others held the door closed as Aguilar attempted to unlock it, before leaving.  See Doe 1 Tr. at 22:20-23:1 (Doe 1).  The Court concludes that the evidence that Aguilar used force in connection with the second incident is insufficient to implicate U.S.S.G. § 2A3.4(a)(1).

The third incident took place when Doe 1 was watching a movie in her uncle Anthony's room, Aguilar unlocked the door, laid down where Doe 1 was lying, got under the blankets, and tried to remove Doe 1's shirt and massage her, but Doe 1 stopped Aguilar.  See Doe 1 Tr. at 32:8-24 (Doe 1, Forensic Interviewer); id. at 33:14-34:12 (Doe 1, Forensic Interviewer); id. at 36:20-37:25 (Doe 1, Forensic Interviewer); PSR ¶ 15, at 6; Supplemental Report at 2.  When Aguilar tried to touch Doe 1, Doe 1 told Aguilar, "[y]ou can't stay in here," and, at some point, Doe 1 left her uncle Anthony's room, and later told her sisters what happened.  Doe 1 Tr. at 32:24-33:7 (Doe 1).  Although the attempt to remove Doe 1's shirt is a physical act, there is no evidence that Aguilar restrained Doe 1 in doing so, particularly given that he was not able to massage Doe 1, because she stopped him.  See Doe 1 Tr. at 37:3-25 (Doe 1, Forensic Interviewer).  See also United States v. Reyes Pena, 216 F.3d at 1211; United States v. Cheresposy, 552 F. Supp. at 1214.  The Court concludes that the evidence that Aguilar used force in connection with the third incident is insufficient to implicate U.S.S.G. § 2A3.4(a)(1).

The Court also concludes that Aguilar did not use threats for purposes of U.S.S.G. § 2A3.4(a)(1), or fear or intimidation for purposes of U.S.S.G. § 2A3.4(a)(2), in connection with his crime.  The record, and particularly Doe 1's hiding from Aguilar behind locked and barricaded doors, see Doe 1 Tr. at 18:6-20 (Doe 1, Forensic Interviewer); id. at 21:21-22:3 (Doe 1); id. at

22:9-10 (Doe 1); id. at 22:20-23:1 (Doe 1), in closets, see Doe 1 Tr. at 22:4-8, under covers, see

Doe 1 Tr. at 22:12-16 (Doe 1), and under her friends and sisters, see Doe 1 Tr. at 26:19-27:19 (Doe

1, Forensic Interviewer), indicates that Doe 1 was afraid of Aguilar.  The Court cannot conclude

from Doe 1's fear, however, that Aguilar's actions constitute "threatening or placing the victim in

fear that any person will be subjected to death, serious bodily injury, or kidnapping," U.S.S.G. §

2A3.4, cmt. n.2, or that they constitute "threatening or placing the victim in fear (other than by

threatening or placing the victim in fear that any person will be subjected to death, serious bodily

injury, or kidnapping)," U.S.S.G. § 2A3.4, cmt. n. 3.  It is understandable that Doe 1 feared

Aguilar, but such generalized fear, in and of itself, does not give rise to grounds for a sentencing

enhancement under U.S.S.G. §§ 2A3.4(a)(1) or 2A3.4(a)(2), particularly in the absence of Aguilar

making threats.  See United States v. Cheresposy, 552 F. Supp. 3d at 1215.  The Court concludes

that the evidence that Aguilar used fear or threats is insufficient to implicate U.S.S.G. §§

2A3.4(a)(1) or 2A3.4(a)(2).

        In determining whether Aguilar should be subject to an upward sentencing adjustment for

the use of force or threats under U.S.S.G. § 2A3.4(a)(1), or fear or intimidation under U.S.S.G. §

2A3.4(a)(2), United States v. Cheresposy is instructive.  See 552 F. Supp. 3d at 1213-15.  In

Cheresposy, the defendant pled guilty to a two-count information charging him with abusive

sexual contact of a child under twelve years of age pursuant to 18 U.S.C. §§ 1153, 2244(a)(5), and

2246(3).  See United States v. Cheresposy, 552 F. Supp. 3d at 1212.  Like Aguilar, the defendant

in United States v. Cheresposy admitted facts regarding his crime in the Plea Agreement but did

not specifically admit to the use of force, threats, fear, or intimidation.  Compare Plea Agreement

¶ 9, at 4 with United States v. Cheresposy, 552 F. Supp. 3d at 1212.  Accordingly, the Court

reviewed the record, as it now does for Aguilar, to determine whether the defendant's actions

implicated U.S.S.G. § 2A3.1(b)(1), which, like § 2A3.4(a)(1), provides an increase if the defendant's conduct involved the use of force or threats under 18 U.S.C. § 2241(a) or (b). Compare U.S.S.G. § 2A3.1(b)(1) with U.S.S.G. § 2A3.4(a)(1).

The defendant in United States v. Cheresposy molested two of his granddaughters, both of whom were under twelve years of age, by directly touching their genitals for twenty to thirty seconds, and told them not to tell anybody. See United States v. Cheresposy, 552 F. Supp. 3d at 1211. Both victims were afraid of the defendant and decided not to report the abuse because they believed the defendant would hurt them. See United States v. Cheresposy, 552 F. Supp. 3d at 1211-12. The Court concluded that the defendant did not use force in abusing the victims because he did not restrain them or use or threaten them with a weapon, or otherwise physically prevent them from escaping the abuse. See United States v. Cheresposy, 552 F. Supp. 3d at 1214. Although the nature of the sexual contact in United States v. Cheresposy is different from Aguilar's crime, they are similar because neither defendant restrained the victim in a way that constitutes the use of force. See United States v. Reyes Pena, 216 F.3d at 1211. Similarly, the Court concluded in United States v. Cheresposy that the defendant had not used threats in connection with his crime, because, "although Cheresposy told both victims not to tell anyone about the sexual contact multiple times, . . . and the victims were afraid that he would hurt them, . . . there is no evidence that the fear was premised on the idea that Cheresposy would 'subject [them] to death, serious bodily injury, or kidnapping.'" United States v. Cheresposy, 552 F. Supp. 3d at 1215 (quoting 18 U.S.C. § 2241(a) and U.S.S.G. § 2A3.1 cmt. n.2)(alteration in United States v. Cheresposy). The Court concluded that the victim's generalized fear of the defendant was not enough to justify the increase under U.S.S.G. § 2A3.1(b)(1). See United States v. Cheresposy, 552 F. Supp. 3d at 1215. The same conclusion holds in this case, where Doe 1 was also afraid of Aguilar, see Doe 1

Tr. at 18:6-20 (Doe 1, Forensic Interviewer); id. at 21:21-22:3 (Doe 1); id. at 22:9-10 (Doe 1); id.

at 22:20-23:1 (Doe 1), id. at 22:4-8, id. at 22:12-16 (Doe 1); id. at 26:19-27:19 (Doe 1, Forensic

Interviewer), but Aguilar did not issue any threats, or tell Doe 1 not to tell anybody about his

actions, like the defendant in United States v. Cheresposy.  Accordingly, the Court concludes that

Aguilar is not subject to an elevated base offense level of 20 under U.S.S.G. § 2A3.4(a)(1) or 16

under U.S.S.G. § 2A3.4(a)(2).

## II.    BECAUSE THE COURT FINDS THAT AGUILAR TOUCHED DOE 1'S GENITALS OVER HER CLOTHES ON AT LEAST TWO OCCASIONS, AGUILAR IS A REPEAT-AND-DANGEROUS SEX OFFENDER AGAINST MINORS SUBJECT TO AN INCREASE UNDER  U.S.S.G. § 4B1.5(b)(1).

The Court sustains the United States' Objection that Aguilar's should be subject to a 5-

level increase in his offense level pursuant to U.S.S.G. § 4B1.5(b)(1).  A preponderance of the

evidence supports a finding that Aguilar is a repeat-and-dangerous sex offender against minors

subject to a 5-level increase in his offense level.  See U.S.S.G. § 4B1.5(b)(1).  For § 4B1.5(b)(1)

to apply, the Guidelines indicate that Aguilar must have "engaged in a pattern of activity involving

prohibited sexual conduct," U.S.S.G. § 4B1.5(b), with prohibited sexual conduct including, in

relevant part, "any offense described in 18 U.S.C. § 2426(b)(1)(A)," U.S.S.G. § 4B1.5 cmt. n.4(a),

which includes, in relevant part, a prior sex offense conviction under chapter 18 of the United

States Code, 18 U.S.C. § 2426(b)(1)(A).  A "pattern of activity" for purposes of applying U.S.S.G.

§ 4B1.5(b) exists if the defendant "on at least two separate occasions . . . engaged in prohibited

sexual conduct with a minor."  U.S.S.G. § 4B1.5 cmt. n.4(B)(i).  "An occasion of prohibited sexual

conduct may be considered . . . without regard to whether the occasion (I) occurred during the

course of the instant offense; or (II) resulted in a conviction for the conduct that occurred on that

occasion."  U.S.S.G. § 4B1.5, cmt. n.4(B).  As the Tenth Circuit has clarified, "a pattern of activity

includes when a defendant engages in sexual conduct against two different minors on separate occasions *or* against the same minor on two different occasions." United States v. Cifuentes-Lopez, 40 F.4th 1215, 1219 (10th Cir. 2022), cert. denied, 143 S. Ct. 467 (2022).  See United States v. Fox, 926 F.3d 1275, 1280 (11th Cir. 2019)("The plain meaning of 'separate occasions' . . . . requires only events that are independent and distinguishable from each other. Multiple, distinct instances of abuse -- whether ongoing, related, or random -- meet the enhancement under § 4B1.5(b)(1).").

        In the PSR Addendum, the USPO states that it did not apply a repeat-and-dangerous-sex-offender-against-minors enhancement under U.S.S.G. § 4B1.5(b)(1) because "the separate incident occasions were not clearly defined in available discovery."  PSR Addendum at 4.  The Court disagrees with the USPO's assessment.  Here, there are at least two separate, identifiable acts of prohibited sexual conduct, i.e., Aguilar's touching Doe 1's genitals over her clothes, to which Aguilar subjected Doe 1.  See United States v. Cifuentes-Lopez, 40 F.4th at 1219 (explaining that a pattern of activity for purposes of U.S.S.G. § 4B1.5(b)(1) includes engaging in sexual conduct against a minor on two different occasions).  It is clear from the February 14, 2021 interview with Doe 1, both based on Doe 1's statements and the Forensic Interviewer's questioning her about three separate incidents, that Aguilar touched Doe 1's genitals over her clothes on multiple occasions.  See Doe 1 Tr. at 17:16-40:11 (Doe 1, Forensic Interviewer).  First, there is the incident in which Aguilar unlocked the door to Doe 1's room during a Dallas Cowboys football game, got into her bed, pulled down the sheets and touched Doe 1's thigh and vagina over her clothes.  See Doe 1 Tr. at 18:6-19:1 (Doe 1, Forensic Interviewer); id. at 25:14-19 (Doe 1, Forensic Interviewer); id. at 29:6-30:22 (Doe 1, Forensic Investigator); id. at 31:1-32:1 (Doe 1, Forensic Interviewer); id. at 38:17-39:8 (Doe 1, Forensic Interviewer); PSR ¶¶ 13, at 5, 16, at 6.  Second,

there is the incident in which Aguilar entered Doe 1's room when her friends and sisters were present and Doe 1 was hiding under blankets, and touched her vagina with his hand through her blanket and over her clothes.  See Doe 1 Tr. at 22:14-19 (Doe 1); id. at 24:4-13 (Doe 1); id. at 24:19-24 (Doe 1, Forensic Interviewer); id. at 26:2-4 (Doe 1); 26:6-10 (Doe 1); id. at 26:13-17 (Doe 1; Forensic Interviewer); id. at 28:2-4 (Doe 1); id. at 28:25-29:5 (Doe 1, Forensic Interviewer); id. at 39:8-49:7 (Doe 1, Forensic Investigator); PSR ¶ 14, at 6; April 23 MOI at 1-2; February 22, 2017 MOI at 1-3.  Finally, there is the third incident, in which, when Doe 1 was watching a movie in her uncle Anthony's room, Aguilar unlocked the door, laid down where Doe 1 was lying, got under the blankets, and tried to remove Doe 1's shirt and massage her, but Doe 1 stopped Aguilar.  See Doe 1 Tr. at 32:8-24 (Doe 1, Forensic Interviewer); id. at 33:14-34:12 (Doe 1, Forensic Interviewer); id. at 36:20-37:25 (Doe 1, Forensic Interviewer); PSR ¶ 15, at 6; Supplemental Report at 2.  Even without considering the third incident, the first two serve as sufficient proof of Aguilar's being a repeat-and-dangerous sex offender against minors under U.S.S.G. § 4B1.5(b)(1).  The Court concludes that Aguilar's touching Doe 1's genitals over her clothes on at least two occasions make him subject to a 5-level increase in his offense level.  See U.S.S.G. § 4B1.5(b)(1).  Because Aguilar's offense level after the 5-level increase does not reach 22, his offense level rises automatically to 22, the minimum offense level under U.S.S.G. § 4B1.5(b)(1), before the application of a 3-level decrease under U.S.S.G. §§ 3E1.1(a) and 3E1.1(b) for Aguilar's accepting responsibility for his crime and pleading guilty.  See U.S.S.G. § 4B1.5(b)(1).  Accordingly, Aguilar's offense level is 19.

**IT IS ORDERED** that: (i) the United States' Sealed Objections to the PSR, filed February 9, 2023 (Doc. 79), are sustained in part and overruled in part; (ii) Defendant Kyle Aguilar's offense

level is 19; (iii) Aguilar's criminal history category is II; and (iii) the United States Sentencing

Guidelines establish an imprisonment range of 33 to 41 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
   United States Attorney
Nicholas James Marshall
Brittany DuChaussee
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*


Buck T. Glanz
Melissa Ayn Morris
Federal Public Defender's Office
Albuquerque, New Mexico

   *Attorneys for the Defendant*