# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                No. CR 21-0670 JB

KYLE AGUILAR,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the United States' Opposed Sealed Motion for Protective Order and Motion *In Limine* to Bar Use of Improper Impeachment Material, filed January 17, 2024 (Doc. 178)("Motion"). The Court held a hearing on January 18, 2024. <u>See</u> Notice of Motion Hearing, filed January 18, 2024 (Doc. 181)(text-only). The primary issue is whether material about two incidents of reprimanded misconduct by the Plaintiff United States of America's primary law enforcement witness, Frank Chavez, a Special Agent with the Bureau of Indian Affairs ("BIA"), disclosed pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972)("<u>Giglio</u>"), may be used to impeach Chavez. The Court concludes that, because of the circumstances in the two incidents indicate that Chavez was not truthful, the Defendant Kyle Aguilar may, on cross-examination, inquire into Chavez' specific instances of conduct that bear on his truthfulness -- such as lies or misrepresentations which Chavez made during internal affairs investigations into his conduct -- but that Chavez may not be questioned about details of the incidents that do not bear on his credibility.

## FACTUAL BACKGROUND

The Court provides this Factual Background solely for the purpose of this Motion, and takes its facts from the Motion and the Superseding Indictment, filed October 4, 2023 (Doc. 126)("Superseding Indictment"). Because these facts largely come from the Motion, the Court acknowledges that this Factual Background -- and the summaries quoted herein -- reflect the United States' summarizations of the relevant events. In this section, the Court describes this case's general nature, before focusing on the conduct relevant to this Motion, namely, Chavez' alleged conduct.

The underlying case in this matter involves allegations that Aguilar engaged in sexual contact with a child who had attained the age of twelve years, but had not achieved the age of sixteen years, contrary to 18 U.S.C. §§ 1153, 2244(a)(5), 2244(a)(3), 2246(3). See Superseding Indictment at 1-2. Chavez, a BIA Special Agent, was involved in the investigation that led to the criminal charges in this case. See Motion at 1; id. at 9-10. Relevant to this Motion, Chavez previously engaged in conduct that the United States disclosed pursuant to its Constitutional obligations under Giglio.

Specifically, in 2011, Chavez was involved in two separate incidents related to his duties as a law enforcement officer that gave rise to internal affairs investigations. See Motion at 2. The first of these incidents involves a dispute between Chavez and his brother. See Motion at 2. As the Motion recounts the incident:

> While off duty, Agent Chavez was notified his brother might be selling livestock that did not belong to him but belonged to Agent Chavez and their father. He confronted his brother about it. Agent Chavez stated his brother pushed him first and initiated the physical contact, but that he defended himself. His brother stated Agent Chavez initiated the physical contact. The assault was not sustained in the internal affairs investigation and the tribal charges were dismissed. Agent Chavez was intoxicated and admitted to not contacting law enforcement to handle the matter of the stolen livestock as he should have.

Motion at 2-3 (citing Final Disposition Report, Internal Affairs Division, United States Department of the Interior (case initiation date September 5, 2011), filed January 17, 2024 (Doc. 178-1); Internal Affairs Case Report, Case No. KOL120-11-083, filed January 17, 2024 (Doc. 178-2)("Case Report July 11 Incident")).

The second incident involves allegations of misconduct at a party held at Chavez' home. Motion at 3-4.  This incident also occurred while Chavez was off duty.  See Motion at 3.  The facts, as the Motion recounts them, are:

> A female became intoxicated, had sexual intercourse with another individual, and then passed out or fell asleep while naked from the waist down.  She, and others including Agent Chavez, had been drinking at a party on Agent Chavez's property. It is against the rules of the Pueblo of Santo Domingo to consume alcohol within the pueblo. While the female was passed out or asleep, other males went to look at her unclothed genitalia, and at least one individual took photos. There is no indication that Agent Chavez participated in those activities. The report indicates the initial incident was on August 5-6, 2011. The first complaint filed by the female regarding the incident was filed approximately on August 12, 2011, after a friend received a photo of that night. The complaint does not indicate when the initial interview with Agent Chavez took place. An internal affairs investigation into Agent Chavez began on August 17, 2011. The victim's complaint against Agent Chavez was that it occurred on his property, and as a law enforcement officer he did not do anything to stop the other individuals from taking naked photos of her when she was passed out or asleep. However, there is no indication in the report that Agent Chavez participated or even knew that this was occurring. As a proffer, Agent Chavez will state he was unaware of any sexual misconduct at his property. He was aware individuals were drinking on his property, which was contrary to the rules of the pueblo, but did not know any sexual misconduct or invasion of privacy might have occurred until a week later when questioned by the officer investigating the incident.

Motion at 3-4 (citing Final Disposition Report, Internal Affairs Division, United States Department of the Interior (case initiation date September 5, 2011), filed January 17, 2024 (Doc. 178-3); Internal Affairs Case Report, Case No. KOL120-11-084, filed January 17, 2024 (Doc. 178-4)("Case Report August 17 Incident")).

## PROCEDURAL BACKGROUND

The Motion notes that, although the United States disclosed the information about these incidents pursuant to Giglio, it states that it did so "[i]n an excess of caution," Motion at 2, and "seeks a protective order regarding the information in the two internal affairs investigations into Agent Chavez," Motion at 4.  In support of this request, the United States first notes that rule 16 of the Federal Rules of Criminal Procedure -- which regulates discovery -- "accords district courts broad authority to regulate and restrict discovery."  Motion at 4 (citing Fed. R. Crim. P. 16(d)(1)). Pursuant to this rule, the United States argues that, in this case, there is good cause for the Court to issue a protective order "limiting defendant or defense counsel from using the information until there is a ruling on whether this is relevant impeachment material permitted to be used at trial." Motion at 4.

After outlining what its proposed protective order would involve, see Motion at 4-5, the United States also argues that the Court should prevent Agular's use of the material to impeach Chavez, see Motion at 5-10.  The United States' request to bar impeachment is based on three arguments: (i) none of the information about these incidents is probative for Chavez' character for truthfulness as required for truthfulness impeachment under rule 608(b), see Motion at 6-7; (ii) any inquiry into these incidences runs the risk of becoming "a diversion into whether the evidence of sexual misconduct of others is true, which does not pertain to Agent Chavez or his veracity," Motion at 8; see id. at 7-8; and, similarly, (iii) under rule 403 of the Federal Rules of Evidence, the Court should exclude any information regarding these two incidents, because that information is "likely to create unfair prejudice, confuse the issues, or mislead the jury than provide little, if any, probative value," Motion at 9.  See Motion at 9-10.

On the first of these arguments, the United States' rule 608 argument, the United States explains that, as it pertains to Chavez' altercation with his brother, "failing to call the police and drinking alcohol illegally are not credibility findings." Motion at 6. They are, as the United States concedes, "misdeeds," but they do not bear on Chavez' credibility. Motion at 6. As rule 608 pertains to the second incident, the United States argues similarly, that "illegally consuming alcohol while off duty does not implicate an individual's truthfulness or credibility as a witness in this matter," and, "[n]either does failing to notify a supervisor of law enforcement contact." Motion at 7 (citing United States v. Novaton, 271 F.3d 968, 1006 (11th Cir. 2001); United States v. Beltran-Garcia, 338 F. App'x 765, 772 (10th Cir. 2009); 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 608.02[2] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 1997)). The United States argues generally that these incidents are, at most, evidence of "insubordination or poor judgment, which does not go to credibility." Motion at 7 (citing Vondrak v. City of Las Cruces, No. CIV 05-0172, 2009 WL 2951027, at *10 (D.N.M. Aug. 14, 2009)(Browning, J.)). Additionally, referencing rule 404(a) of the Federal Rules of Evidence, the United States argues that, under that provision, an agent "cannot be questioned regarding a time in the past in which he may not have been sufficiently diligent, to now suggest that he was not sufficiently diligent in the investigation before the Court," and this result is because, the United States argues, "diligence is not proper impeachment." Motion at 7.

The second and third arguments that the United States makes are related to one another. In essence, the United States contends that any inquiry of these events "would take this case far afield" and lead the jury to focus on matters that are unrelated to the allegations at issue in this case. Motion at 8. On this account, the United States argues that the Court runs the risk that the inquiries into Chavez' incidents would become, in effect, a mini-trial. See Motion at 8-9.

Additionally, the United States contends that, "even if the claims are <u>Giglio</u> information and have some marginal relevance to the veracity of a government witness," any questions about these matters would be unduly prejudicial, and, in the absence of any significant probative value, the evidence should be excluded under rule 403.  Motion at 9.

The Court heard the Motion the day after it was filed.  <u>See</u> Notice of Motion Hearing, filed January 18, 2024 (Doc. 181)(text-only).  Given that there was no time in which Aguilar could file a response, the Court began the hearing by querying Aguilar about his "thoughts" on the Motion. Draft Transcript of January 18, 2024, Motion Hearing at 2:4 (held January 18, 2024)(Court)("Jan. 18 Tr.").[1]  In response to this question, Aguilar stated that he "partially agree[s] with the Government," Jan. 18 Tr. at 2:8-9 (Hart), in the sense that some of the material related to the incidents, such as "the mere allegation of getting into a fight with your brother is not Giglio material," Jan. 18 Tr. at 2:19-20 (Hart).  Aguilar contended, however, that "mixed into those incidences are multiple issues of truthfulness," Jan. 18 Tr. at 2:14-15 (Hart), including Chavez initially stating that he had not been drinking at the time of the altercation with his brother, but that he "later changed his answer," and that "is a truthfulness issue," Jan. 18 Tr. at 2:20-23 (Hart). Aguilar also asserted that there are "other misrepresentations throughout these reports," Jan. 18 Tr. at 3:1-2 (Hart), including the idea that a BIA agent "wasn't sure whether it was unlawful on the pueblo to drink," Jan. 18 Tr. at 3:9-10 (Hart), as well as "[t]he fact that he's . . . been found two times to have engaged in official misconduct," and lied "throughout this process . . . as he has conflicting statements throughout the entire investigation," Jan. 18 Tr. at 3:17-4:2 (Hart).  Aguilar asserts that Chavez has "a history of violating the pueblo's laws, then lying about it to federal

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

agents during internal investigations of being found to have substantiated official misconduct."
Jan. 18 Tr. at 4:4-7 (Hart).  Aguilar also stated that "[t]he types of allegations that we have here,
what he is getting . . . disciplined for is conduct . . . related to a sexual assault," and "I think that
play[s] into how . . . he would investigate sexual assault cases going forward."  Jan. 18 Tr. at 4:16-
21 (Hart).  Aguilar acknowledged that certain parts of the materials regarding Chavez' incidents
were "not Giglio material," Jan. 18 Tr. at 4:4-7 (Hart), such as: "the fact that he was charged in
tribal court with this assault on his brother and it was dismissed," Jan. 18 Tr. at 5:16-18 (Hart);
"the nature of the assault itself," Jan. 18 Tr. at 6:14-15 (Hart);  information about "some claim he
made finger gestures saying that . . . I want to put a bullet in your head," Jan. 18 Tr. at 6:16-17
(Hart); and "detail[s] about what the sexual assault was" that took place at Chavez' property, Jan.
18 Tr. at 6:23-24 (Hart).

      The United States stated that it was not certain about Aguilar's claim that Chavez had lied
about his drinking on the day of Chavez' altercation with his brother, but noted that "[t]here is a
chance that might be relevant, because that would seem to be impeachment that he might have
lied."  Jan. 18 Tr. at 9:2-4 (Marshall).  As to the other contentions, however, the United States
asserted that the following do not "rise to the level of Giglio":

> the conduct unbecoming of an officer related to drinking on the job -- or not
> drinking on the job, drinking in a place where he was not supposed to drink, and
> knowing he should have called law enforcement to assist him rather than take
> matters into his own hands with his brother.

Jan. 18 Tr. at 9:5-10 (Marshall).  The United States discussed two of the Court's cases -- United
States v. Aranda-Diaz, No. CR 12-2686, 2014 WL 459607, at *5 (D.N.M. Jan. 8, 2014)(Browning,
J.), and United States v. Sangiovanni, No. CR 10-3239, 2013 WL 2285086, at *8 (D.N.M. May
13, 2013)(Browning, J.) -- for the proposition that impeachment under rule 608 is about "looking
to see if a person has a propensity to lie," Jan. 18 Tr. at 10:3-4 (Marshall), and therefore, "there

has to be [material] specifically implicating the veracity of the witness," Jan. 18 Tr. at 10:10-11 (Marshall).  According to the United States, this impeachment must involve "affirmative acts of deceit, making a false statement or falsifying a report."  Jan. 18 Tr. at 10:13-15 (Marshall).  In this case, the United States contended, Chavez' conduct is "an act of omission, by failing to do something as required by his work, by reporting that he had contact with law enforcement," and that, "misconduct generally does not go to a person's truthfulness.  It doesn't implicate some sort of veracity, the fact that someone has had misconduct in the past."  Jan. 18 Tr. at 10:20-11:6 (Marshall).  The United States acknowledged that "we need to do perhaps a deeper dive on the issue of whether or not there were factual misrepresentations to the officer," but also noted that, "even that, I don't know what kind of probative value it would have."  Jan. 18 Tr. at 11:17-20 (Marshall).

Aguilar objected that the United States "seems to equate Giglio with only 608 and character for truthfulness," but that "Giglio is about anything that bears on a witness' credibility."  Jan. 18 Tr. at 13:15-17 (Hart).  In this vein, Aguilar stated that, "when it comes to these charges of official misconduct, what is there is that Agent Chavez was given the policies and rules that he had to follow," and that "[h]e acknowledged that he read them and that he was going to follow them . . . then he did not do so."  Jan. 18 Tr. at 13:23-14:2 (Hart).  Aguilar also asserted that, "when he did not do so, he lied about it," and, "all of that put together goes to credibility, and that is the classic Giglio issue that we have."  Jan. 18 Tr. at 14:3-5 (Hart).  Aguilar also notes that

> what is different about the sexual misconduct case than the assault case is that the assault case has a charge that was dismissed.  I think the case law is very clear that just because there is a charge that get dismissed, doesn't mean that that gets to be used against you; otherwise it falls into some other type of category.
>
> But here, you know there are contradictions and statements that go directly against everything that Agent Chavez initially contends until he's caught in his lies.

- 8 -

Jan. 18 Tr. at 14:20-15:5 (Hart).  In short, Aguilar contended that there are "serious truthfulness issues baked into that."  Jan. 18 Tr. at 15:13-14 (Hart).

The United States responded that "some of the things that counsel is raising with regards to the truthfulness, there was not a finding on those issues," Jan. 18 Tr. at 15:24-16:3 (Marshall), but rather that this information comes "from another witness who was known to be extremely intoxicated at that time, and it was their recollection," Jan. 18 Tr. at 16:3-6 (Marshall).  The United States again asserted that, "[i]f there is . . . something that counsel has that is factual that he lied about, that is something we need to address," but that, "so far, counsel has not brought forward such a claim."  Jan. 18 Tr. at 17:8-11 (Marshall).  Following these presentations, the Court stated that "I think there is some impeachment stuff here," but also that "I don't think everything in here needs to come in, or should, because some of it, it's just kind of bad acts or omissions by Mr. Chavez."  Jan. 18 Tr. at 17:15-23 (Court).  The Court also stated that it thought that "largely what Mr. Hart is proposing is a good line," and therefore that it generally would follow Aguilar's proposal about the scope of permissible impeachment regarding the incidents.  Jan. 18 Tr. at 18:2-4 (Court).   The Court therefore stated that the Motion is "denied in part, and granted in part," Jan. 18 Tr. at 19:12-13 (Court), and directed Aguilar to "stay close to the line about making sure the questions go to credibility and impeach him, rather than getting into bad character," Jan. 18 Tr. at 17:24-18:2 (Court).

## LAW REGARDING RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence."
United States v. Gutierrez-Castro, No. CR 10-2072, 2011 WL 3503321, at *3 (D.N.M. Aug. 6,
2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is relevant if: **(a)** it has any tendency to
make a fact more or less probable than it would be without the evidence; and **(b)** the fact is of
consequence in determining the action." (emphasis in original))).   "Rule 401 contains a low
threshold for relevance, because '[a]ny more stringent requirement is unworkable and
unrealistic.'"   United States v. Goxcon-Chagal, 885 F. Supp. 2d 1118, 1162 (D.N.M.
2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).   Irrelevant evidence,
or that evidence which does not make a fact of consequence more or less probable, however, is
inadmissible.   See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is
substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing
the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative
evidence." Fed. R. Evid. 403.   Under rule 403, the trial court must weigh the proffered evidence's
probative value against its potential for unfair prejudice.   See United States v. Record, 873 F.2d
1363, 1375 (10th Cir. 1989).   "[I]t is only *unfair* prejudice, *substantially* outweighing probative
value, which permits exclusion of relevant matter [under rule 403]."   United States v. Pettigrew,
468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir.
1991))(emphasis in United States v. Pettigrew and United States v. Sides).   "In performing the 403
balancing, the court should give the evidence its maximum reasonable probative force and its
minimum reasonable prejudicial value." Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262,
1274 (10th Cir. 2000).   The "exclusion of evidence under Rule 403 that is otherwise admissible

under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(citing 1 S. Childress & M. Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed.1999)). See United States v. Silva, 889 F.3d 704, 712 (10th Cir. 2018)("'The district court has considerable discretion in performing the Rule 403 balancing test,'" but "'exclusion of evidence under Rule 403 that is otherwise admissible under the other rules 'is an extraordinary remedy and should be used sparingly.'" (quoting United States v. Tan, 254 F.3d 1204, 1211 (10th Cir. 2001))).

Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury, or if the evidence otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). "Evidence is not unfairly prejudicial merely because it is damaging to an opponent's case." United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(quoting United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue

tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note)(emphasis in original).  See United States v. Valencia-Montoya, No. CR 11-2990, 2012 WL 8251407, at *11 (D.N.M. Sept. 17, 2012)(Browning, J.)(applying rule 403).

## LAW REGARDING RULE 608 EVIDENCE

"Rule 608 of the Federal Rules of Evidence provides certain mechanisms for attacking witnesses' character for truthfulness or untruthfulness."  Montoya v. Sheldon, No. CIV 10-0360, 2012 WL 5476882, at *7 (D.N.M. Oct. 31, 2012)(Browning, J.).  See United States v. Huerta-Rodriguez, 83 Fed. R. Evid. Serv. 681, 2010 WL 3834061, at *7 (D.N.M. 2010)(Browning, J.)(same).  As the Tenth Circuit has stated in the context of rule 608(b) impeachment, "[o]nce a [witness] takes the stand, her credibility is at issue as with any other witness."  United States v. Schuler, 458 F.3d 1148, 1155 (10th Cir. 2006)(citing United States v. Girdner, 773 F.2d 257, 261 (10th Cir. 1985)).  See United States v. Thomas, No. CR 18-0458, 2019 WL 135322, at *1 (D.N.M. January 8, 2019)(Johnson, C.J.)(noting that "[c]redibility is generally at issue once a witness takes the stand"); United States v. Johnson, 872 F.2d 612, 619 (5th Cir. 1989)("Upon taking the stand, a witness is subject to being impeached in the area of truthfulness.").

As Saltzburg, Martin, Capra, and Berch, note, "[t]he rules set forth two means by which to attack a witness's character for veracity": (i) rule 608(a), which "provides that a party may call a witness to testify about another witness's bad character for truthfulness" provided they are qualified to do so; and (ii) rules 608(b) and 609, which allow inquiry "about specific bad acts[2]

---

[2]Or, in the case of rule 609, certain convictions that correspond to those specific bad acts. See Fed. R. Evid. 609.  As Saltzburg notes, the attack is, in essence, the same:

> Rule 608(b) allows a party to refer to pertinent specific acts to impeach a
> witness by showing that he has a bad character for truthfulness.  If the party wants

that are pertinent to untruthfulness, while the witness is testifying." 3 Steven A. Saltzburg, Michael

M. Martin, Daniel J. Capra & Jessica Berch, Federal Rules of Evidence Manual § 608.02 (13th ed.

2023)(footnoted omitted)("Saltzburg").

> Rule 608(a) states:
>
> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Fed. R. Evid. 608(a). The truthfulness or untruthfulness of a witness may be attacked by opinion

or reputation evidence without ever proffering evidence of a good character for truthfulness. See

United States v. Holt, 486 F.3d 997, 1002 (7th Cir. 2007)(noting that, while it is within the trial

court's discretion to prohibit cross-examination of a police officer as to whether he had been

suspended to call into question his credibility, the plaintiff "could have used Rule 608(a) and called

a member of the department to testify directly about his opinions or reputation of [the credibility

of the officer]"). To establish a proper foundation for the opinion or reputation testimony, a

witness must show "such acquaintance with the person under attack, the community in which he

has lived and the circles in which he has moved, as to speak with authority of the terms in which

generally he is regarded." United States v. Rios, 92 F.3d 1519, 1529 (10th Cir. 1996)(quoting

United States v. Bedonie, 913 F.2d 782, 802 (10th Cir. 1990)), overruled on other grounds by,

United States v. Flowers, 464 F.3d 1127 (10th Cir. 2006).

---

to use prior *convictions* to show the witness's bad character for veracity, Rule 609 applies -- the attack is the same, showing bad character for truthfulness, but both the Advisory Committee and Congress were of the view that prior convictions raise somewhat different concerns and should be treated in a separate rule.

3 Saltzburg, supra § 608.02.

Rule 608(b), which Saltzburg notes is the "ordinarily more productive way to attack a witness's character for truthfulness," 3 Saltzburg, supra § 608.02, provides the rule for admission of specific instances of conduct:

> **Specific Instances of Conduct.**  Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.  But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> **(1)**   the witness; or
>
> **(2)**   another witness whose character the witness being cross-examined has testified about.

Fed. R. Evid. 608(b).  "Under Federal Rule of Evidence 608(b), specific unrelated instances of a witness's prior misconduct may be used to impeach the witness at the discretion of the court, however, only to the extent the misconduct reflects on the witness's character for truthfulness." United States v. Beltran-Garcia, 338 F. App'x at 770.  As noted, any testifying witness inherently puts their credibility and truthfulness at issue.  United States v. Schuler, 458 F.3d at 1155; United States v. Johnson, 872 F.2d at 619.  Following from this premise, a leading treatise notes:

> The credibility of any witness, including a reputation or opinion witness, may be attacked on cross-examination by questioning the witness concerning specific instances of his conduct not leading to a conviction if the court in the exercise of its discretion finds that the specific instance is probative of the witness' character for untruthfulness, Rule 608(b)(1).

4 Michael H. Graham, Handbook of Federal Evidence, § 608:4 (9th ed. 2023).  "Though Rule 608 does not explicitly specify how the trial court should exercise its discretion, the discretion must be exercised within the ambit of the other rules of evidence, including Rules 401, 402, and 403, which address the relevance and probative value of possible evidence." United States v. Beltran-Garcia, 338 at 770.  As the Court has noted, moreover, "[e]ven when the Court permits inquiry under rule

608(b), however, witnesses may invoke their privilege against self-incrimination." United States

v. DeLeon, 308 F. Supp. 3d 1229, 1234 (D.N.M. 2018)(Browning, J.)(citing Fed. R. Evid. 608).

The application of this rule comes with some analytical difficulty in determining the

specific conduct with which a witness may be impeached.  As the United States Court of Appeals

for the District of Columbia Circuit has noted:

> Although 608(b) of the Federal Rules of Evidence does state that specific instances
> of misconduct may be admissible to impeach a witness, that rule does not require
> or imply that every negative bit of evidence existing concerning a witness may be
> dragged into a case no matter how remote or minor the alleged misconduct.

United States v. Lafayette, 983 F.2d 1102, 1106 (D.C. Cir. 1993).  Indeed, as noted, under rule

608(b), "[t]he trial court in its discretion may allow inquiry into the prior conduct of a witness

concerning his character for truthfulness."  United States v. Atwell, 766 F.2d 416, 420 (10th Cir.

1985).  Accordingly, then, a key question in determining the proper scope of rule 608(b)'s

allowance of inquiry into specific instances of conduct is determining what kind of conduct bears

on a "witness's character for truthfulness."  Fed. R. Evid. 608(b).

The rule itself does not indicate what acts might bear on a witness' truthfulness, and nor

do the Advisory Committee Notes.  This absence presents conceptual challenges, because all sorts

of conduct conceivably might have some relationship to a person's propensity to fabricate.  As

Saltzburg aptly observes:

> In a sense, all bad acts of a witness are pertinent to the witness's character
> for untruthfulness.  If the act is "bad," it ordinarily indicates some transgression of
> law.  If the witness was willing to disrespect the law -- to place his own interests
> above those of society -- that is at least somewhat probative of the proposition that
> the witness is also willing to disrespect the oath and lie on the stand.  Yet Rule 608
> clearly does not contemplate automatic impeachment with all of a witness's bad
> acts.  As the Advisory Committee stated in its Note to Rule 608, the trial court must
> also apply Rule 403 to determine whether the probative value of the bad act as to
> the witness's untruthful character is substantially outweighed by the risk of unfair
> prejudice, confusion and delay.

3 Saltzburg, supra § 608.02 (footnoted omitted).  Acknowledging this difficulty, the treatise then offers various analytical factors for courts to consider when determining whether to allow inquiry into a specific act bearing on truthfulness under rule 608(b).  See 3 Saltzburg, supra § 608.02.  The first such factor, and perhaps the most important, is a consideration of the "[d]ishonest nature of the act," 3 Saltzburg, supra § 608.02, and the treatise suggests that courts use the "dishonest act or false statement" framework from rule 609(a)(2) to aid this analysis:

> While every bad act is somewhat probative of veracity, it is clear that acts that involve dishonesty or lying are more probative of a propensity to lie on the stand than acts that do not.  Rule 609 draws a distinction in its text between crimes of dishonesty and other crimes in the text of the rule, and there is every reason for courts applying Rules 608 and 403 to take account of this distinction as a matter of logic, even it is not specified in those rules.

3 Saltzburg, supra § 608.02.  This approach has interpretive appeal.  On a basic level, the underlying rule 609 framework is an acknowledgement that certain "bad" acts have a greater relationship to honesty than do other "bad" acts.  For example, most would agree that lying on a job application about a prior criminal conviction bears on truthfulness.  See United States v. Redditt, 381 F.3d 597, 602 (7th Cir. 2004)(concluding that "[b]ecause Redditt failed to identify her conviction on the employment application," that fact "was relevant to her character for truthfulness").  This conclusion is true despite the fact that lying on a job application is, under most circumstances, not itself a crime.  On the other hand, some unlawful acts, like consuming illegal drugs, do not obviously reflect on a person's character for truthfulness.[3]  See United States v.

---

[3]Evidence of drug use might, however, be appropriate for some other impeachment purpose, such as impeaching a witness' sensory or mental faculties that might affect their ability to perceive or recall events.  See United States v. Apperson, 441 F.3d 1162, 1195-96 (10th Cir. 2006)("'A witness's use of drugs may not be used to attack his or her general credibility, but only his or her ability to perceive the underlying events and testify lucidly at the trial.'" (quoting Jarrett v. United States, 822 F.2d 1438, 1446 (7th Cir. 1987))); United States v. Sangiovanni, No. CR 10-3239, 2013 WL 2285086, at *8 (D.N.M. May 13, 2013)(Browning, J.)(allowing impeachment testimony "regarding her previous and current use of drugs" for the use of casting doubt on the witness' competency to recall events).  The Court notes that there is some tension in the Tenth

Pickard, 211 F. Supp. 2d 1287, 1292 (D. Kan. 2002)(Rogers, J.)("Drug use is not admissible under Rule 608(b) because it is not probative of truthfulness.")(citing United States v. McDonald, 905 F.2d 871, 875 (5th Cir. 1990)).  In short, as Saltzburg suggests, in making a determination what prior acts can be inquired into under rule 608(b), it is appropriate to consider the substance of the prior act and assess the extent to which the act in question involves dishonesty.

Aside from this factor, Saltzburg offers six other factors that courts may consider when assessing the propriety of prior acts impeachment under rule 608(b): (i) the prior act's temporal remoteness, i.e., the longer ago the dishonest act, the less it is informative regarding present-day trial credibility;[4] (ii) the availability of impeachment on other grounds; (iii) the importance of the witness' credibility to the theory of either party; (iv) the inflammatory nature of the prior bad act -- a consideration that is closely related to a court's rule 403 analysis; (v) the similarity of the prior

---

Circuit around this issue more broadly, because although United States v. Apperson, 441 F.3d at 1195-96, states that "[a] witness's use of drugs may not be used to attack his or her general credibility, but only his or her ability to perceive the underlying events and testify lucidly at the trial," the Tenth Circuit also has a pattern instruction that states:

> The testimony of a drug abuser must be examined and weighed by the jury with greater caution than the testimony of a witness who does not abuse drugs.
>
> [Name of witness] may be considered to be an abuser of drugs.
>
> You must determine whether the testimony of that witness has been affected by the use of drugs or the need for drugs.

Crim. Pattern Jury Instructions, Crim. Pattern Jury Instruction Comm. of the United States Court of Appeals for the Tenth Circuit, Witness's Use of Addictive Drugs § 1.16, at 30.  Although this pattern instruction's meaning is somewhat cryptic, it could be fairly interpreted to be a broad comment on the credibility -- or truthfulness -- of a person who uses drugs.

[4]As Saltzburg notes, "[a]s originally proposed, Rule 608(b) prohibited the admission of 'remote' acts of misconduct.  In order to provide for more flexibility, Congress deleted this limitation.  However, remoteness remains an important consideration, because the older the act, the less it says about the witness' *current* propensity to lie on the stand." 3 Saltzburg, supra § 608.02 (emphasis in Saltzburg).

bad act to the issue in the case, i.e., if the witness is the defendant, and the prior bad act is similar

or identical to the fact being tried, rule 608(b) should not be used to back-door in evidence that

rule 404(b) prohibits; and (vi) the relationship of the witness to the case.  See 3 Saltzburg, supra

§ 608.02.  These factors -- along with others that may be appropriate to a particular case -- should

be used to assess the propriety of allowing or restricting impeachment testimony of a witness'

character for truthfulness under rule 608(b).

Rule 608(b) also prohibits the introduction of extrinsic evidence "to prove specific

instances of a witness's conduct in order to attack or support the witness's character for

truthfulness." Fed. R. Evid. 608(b).  Rule 608 was amended in 2003 "to clarify that the absolute

prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is

to attack or support the witness' character for truthfulness," and not "to bar extrinsic evidence for

bias, competency and contradiction impeachment."  Fed. R. Evid. 608 advisory committee's note

to 2003 amendment.  The rule precluding the

> admission of extrinsic evidence of specific instances of conduct of the witness when
> offered for the purpose of attacking credibility . . . does not apply, however, when
> extrinsic evidence is used to show that a statement made by a defendant on direct
> examination is false, even if the statement is about a collateral issue.

United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994)(citing 27 Charles A. Wright &

Victor J. Gold, Fed. Practice and Procedure: Evidence § 5096, at 546-47 (1990)).  This doctrine,

"known as 'specific contradiction,'" allows such impeachment "even if the evidence elicited . . .

ordinarily might be collateral or otherwise inadmissible."  United States v. Crockett, 435 F.3d at

1313 (citing Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1456 (10th Cir. 1997)).  See

United States v. Cerno, 529 F.3d 926, 944 (10th Cir. 2008)("If there is evidence that specifically

contradicts a witness's testimony, impeachment evidence is admissible to demonstrate that the witness lacks credibility and has a propensity for lying.").[5]

It is generally true that "a party may inquire into specific instances of conduct by extrinsic evidence only on cross-examination of a witness in challenging the truthfulness of his testimony." See Bennet v. Longacre, 774 F.2d 1024, 1027 (10th Cir. 1985). Where a party has already attacked a witness' credibility by cross-examination on specific instances of conduct and the witness made a false statement on the stand, however, the party may provide extrinsic evidence to impeach that witness on re-direct or during a later direct examination. See United States v. Embry, 452 F. App'x at 835 ("Rule 608(b)(1) . . . allows impeachment testimony . . . on direct or redirect examination . . . where a party already has attacked the credibility of a witness by referring to specific instances of conduct."). When a witness makes a false statement while providing testimony, the opposing party is allowed to prove that lie by presenting rebuttal witnesses. See United States v. Crockett, 435 F.3d 1305, 1313 (10th Cir. 2006)("[W]hen a defendant makes a false statement during direct testimony, the prosecution is allowed to prove, either through cross-examination or by rebuttal witnesses, that the defendant lied as to that fact.").

Moreover, in addition to impeachment that attacks a witnesses' credibility, it is "permissible impeachment to expose a witness's bias." United States v. Baldridge, 559 F.3d 1126, 1135 (10th Cir. 2009)(citing United States v. Abel, 469 U.S. 45, 51 (1984)). "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically

_____

[5]Professors Charles Alan Wright and Victor James Gold recognize that, before the 2003 amendment, the "greater weight of authority" held that "Rule 608 regulates only the admissibility of character evidence and that subdivision (b) should not be read literally." 28 Charles A. Wright & Victor J. Gold, Fed. Practice and Procedure § 6117, at 86 (1993 & Supp. 2011). Professors Wright and Gold confirm that, as a result of the 2003 amendment, rule 608(b) "has been amended to make clear that it applies only to extrinsic evidence of conduct offered for the purpose of proving character for truthfulness or untruthfulness." 28 Wright & Gold, supra § 6117, at 14 (supp. 2011).

been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." United States v. Abel, 469 U.S. at 52.  Thus, because bias is never collateral, "it is permissible to [prove bias] by extrinsic evidence." Montoya v. City of Albuquerque, No. CIV 03-0261, 2004 WL 3426435, at *4 (D.N.M. May 18, 2004)(Browning, J.).  The Tenth Circuit describes bias, based on its definition at common law, as "the relationship between a witness and a party which might cause the witness to slant his testimony for or against the party." United States v. Baldridge, 559 U.S. F.3d at 1135 (citing United States v. Abel, 469 U.S. at 52).[6]  Moreover, although the Federal Rules of Evidence do not explicitly allow or restrict impeachment based on bias, the Supreme Court has noted that it is "obviously correct" that, despite this omission, the drafters of the rules did not intend to "scuttle entirely the evidentiary availability of cross-examination for bias." United States v. Abel, 469 U.S. at 50.

## ANALYSIS

The Court concludes that Aguilar may, pursuant to rule 608(b), inquire into certain specific instances of Chavez' past conduct that relate to his character for truthfulness.  More specifically, the Court allows Aguilar to inquire into specific instances -- during Chavez' two internal affairs

---

[6]Prejudice is defined as "[a] preconceived judgment or opinion formed with little or no factual basis; a strong and unreasonable dislike or distrust." Prejudice, Black's Law Dictionary (11th ed. 2019).  See New Oxford American Dictionary, Prejudice, 1378 (3d ed. 2010) ("[P]reconceived opinion that is not based on reason or actual experiences . . . dislike, hostility. . . .").  Bias is defined as: "A mental inclination or tendency; prejudice; predilection." Bias, Black's Law Dictionary (11th ed. 2019).  Although bias and prejudice -- in common parlance -- may be used interchangeably, with courts and lawyers both asserting that one has both bias and prejudice for or against something, they historically have been and are often distinguished by saying that there may be "bias or prejudice." E.g., Nev. Comm'n on Ethics v. Carrigan, 564 U.S. 117, 123-24 (2011)(quoting 28 U.S.C. § 144, which makes "any 'personal bias or prejudice' a basis for recusal").  Again, in common parlance, bias is associated more with an informed reason for favoring a person and prejudice with an uninformed hostility toward a class of persons.  Bias, however, now appears to be all inclusive, covering prejudice, too, and prejudice covers bias if the preposition "for" follows.  The terms have thus apparently lost any distinction.

investigations -- in which Chavez changed his story, or provided evasive or implausible responses to investigating officers. Below, the Court provides an analysis of some such incidents. For other incidents not here discussed, however, before Aguilar questions Chavez about any other incidents bearing on Chavez' untruthfulness, counsel must approach the bench and outline his good faith basis in the reports how Chavez made a conflicting or otherwise untruthful statement.

One incident discussed by Aguilar during the January 18 hearing is an allegation that, during the internal affairs investigation into the second incident, Chavez stated that he "wasn't sure whether it was unlawful on the pueblo to drink." Jan. 18 Tr. at 3:9-10 (Hart). A review of the relevant case report for the party incident, see Case Report August 17 Incident at 12-16, confirms that Chavez' statements during the investigation into this incident lead to a reasonable conclusion that Chavez was not entirely truthful about whether he knew it was lawful to drink at the time and place of the incident. Specifically, the case report indicates that Chavez initially stated that, "it is illegal to drink on the reservation but [that he] does not consider this area to be reservation," because "he wasn't sure how to classify the land as tribal property or a Spanish land grant." Case Report August 17 Incident at 12. In a later interview, however, Chavez stated that he was unsure about the legality of the drinking because "the laws change from year to year on the pueblo depending on what the governor at the time wants," and therefore Chavez was "unsure if alcohol was illegal at the time of this incident because it changes constantly." Case Report August 17 Incident at 15. Moreover, as Aguilar asserted at the January 18 hearing, Chavez' role as a law enforcement official, whose duty area covers the Pueblo, adds further reason to believe that Chavez knew that the drinking was illegal, and was untruthful about that knowledge during the investigation. See Jan. 18 Tr. at 3:9-14 (Hart); id. at 3:1-5 (Hart); id. 4:12-16 (Court, Hart). The Court concludes that Chavez' evasiveness on this question despite his knowledge of the law, and

- 21 -

his evolving rationalizations for his conduct, lead the Court to conclude that this incident is relevant to Chavez' character for truthfulness, and thus Aguilar may inquire into this matter to impeach Chavez during cross-examination.

Another incident that the Court concludes bears on Chavez' character for truthfulness is his representations about whether he had been drinking alcohol during the time of the altercation with his brother.  See Jan. 18 Tr. at 2:20-23 (Hart).  As noted above, it is not the mere fact of drinking alcohol that bears on Chavez' truthfulness, but rather his representations -- made during the internal affairs investigation -- about whether he had been drinking at the time of the altercation.  Cf. Bennett v. Longacre, 774 F.2d 1024, 1027 (10th Cir. 1985)(affirming "the district court's findings and conclusion" that the defendant's "previous actions in indulging in alcohol and illegal drugs, without more, would not have any probative value on his 'character for . . . untruthfulness'" (source of quoted material not cited)).  When first questioned about whether he had been drinking at the time of the altercation, Chavez responds, "no," but later states that he had been drinking "the night before," and later elaborates that, "he thought it would be out of his system since he was working in the fields that morning."  Case Report July 11 Incident at 11.  In addition to these unclear and arguably contradictory statements, virtually all witnesses who interacted with Chavez on the day of the incident state that he appeared very intoxicated, see Case Report July 11 Incident at 10; id. at 12; id. at 13; id. at 19; id. at 21; id. at 24, and a police officer who transported Chavez to the trial office that day stated that he "could smell a strong odor of alcohol coming from [Chavez'] breath and his eyes were bloodshot," Case Report July 11 Incident at 10.  On the basis of Chavez' own unclear and evasive statements, combined with multiple reports that Chavez appeared intoxicated the day of the altercation, the Court concludes that Chavez' representations -- made during the internal affairs investigation -- about whether he had been

drinking at the time of the altercation bear on his character for truthfulness.  Accordingly, the Court

will allow Aguilar to inquire into this untruthfulness for the purposes of impeachment.

To reiterate these points, and to provide the parties in this matter with a visual guide of the

Court's rulings at the January 18 hearing, the Court provides the parties with the following chart:

| Specific Instance of Conduct | May Chavez be Questioned About this Incident? |
|---|---|
| Information related to "the mere allegation" that Chavez and his brother were involved in a physical altercation. Jan. 18 Tr. at 2:19-20 (Hart). | No.[7] |
| Potential untruthful statements or representations made during the internal affairs investigation about whether Chavez was drinking on the day of the altercation with his brother.  See Jan. 18 Tr. at 2:20-23 (Hart); id. at 9:2-4 (Marshall)(noting that, a lie about the drinking "might be relevant, because that would seem to be impeachment that he might have lied"). | Yes, provided that Aguilar has a good-faith basis in the reports for his belief that Chavez was untruthful in making the statement. |
| An incident in which, during the internal affairs investigation into the second incident -- the party at Chavez' residence -- Chavez stated that he "wasn't sure whether it was unlawful on the pueblo to drink." Jan. 18 Tr. at 3:9-10 (Hart). | Yes, provided that Aguilar has a good-faith basis in the reports for his belief that Chavez was untruthful in making the statement. |
| Incidents in which Chavez makes "conflicting statements" during any internal affairs investigation into either incident.  Jan. 18 Tr. at 3:17-4:2 (Hart). See Jan. 18 Tr. at 4:4-7 (Hart(arguing that Chavez | Yes, however, given the generality of this category of potential "conflicting statements," before Aguilar questions Chavez about any conflicting statement |

[7]See Jan. 18 Tr. at 17:15-23 (Court)(noting that "I think there is some impeachment stuff here," but also that "I don't think everything in here needs to come in, or should, because some of it, it's just kind of bad acts or omissions by Mr. Chavez"); id. at 17:24-18:2 (Court)(warning Aguilar to "stay close to the line about making sure the questions go to credibility and impeach him, rather than getting into bad character").

| | |
|---|---|
| has "a history of violating the pueblo's laws, then lying about it to federal agents during internal investigations of being found to have substantiated official misconduct"); id. at 14:20-15:5 (Hart)("But here, you know there are contradictions and statements that go directly against everything that Agent Chavez initially contends until he's caught in his lies."). | of this nature, counsel must approach the bench and outline his good-faith basis in the reports how Chavez made a conflicting or otherwise untruthful statement. |
| "[T]he fact that he was charged in tribal court with this assault on his brother and it was dismissed." Jan. 18 Tr. at 5:16-18 (Hart). | No. |
| "[T]he nature of the assault itself."  Jan. 18 Tr. at 6:14-15 (Hart). | No. |
| An incident in which Chavez is alleged to have "made finger gestures saying that . . . I want to put a bullet in your head." Jan. 18 Tr. at 6:16-17 (Hart). | No. |
| "[D]etail about what the sexual assault was" that took place at Chavez' property.  Jan. 18 Tr. at 6:23-24 (Hart). | No. |

Although the Court allows inquiry into incidents -- such as those described above -- that bear on Chavez' character for truthfulness, the Court concludes that many details of the two internal affairs reports are not proper impeachment material.  For example, as noted, the mere fact of Chavez' alcohol use does not -- on its own -- bear on Chavez' character for truthfulness, and likewise the mere fact of Chavez' physical altercation with his brother does not go to Chavez' truthfulness.  Accordingly, the Court reiterates its warning that Aguilar "stay close to the line about

making sure the questions go to credibility and impeach him, rather than getting into bad character." Jan. 18 Tr. at 17:24-18:2 (Court).

**IT IS ORDERED** that: (i) the United States' Opposed Sealed Motion for Protective Order and Motion *In Limine* to Bar Use of Improper Impeachment Material, filed January 17, 2024 (Doc. 178), is denied in part and granted in part; (ii) Plaintiff United States of America's request for a protective order is denied; (iii) Defendant Kyle Aguilar is permitted to impeach Frank Chavez by inquiring into incidents from Chavez' internal affairs investigations that bear on his character for truthfulness; and (iv) Aguilar is not permitted to impeach Chavez by inquiring into parts of these incidents that do not bear on Chavez' character for truthfulness.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
   United States Attorney
Nicholas James Marshall
Mia Ulibarri-Rubin
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Nicholas Thomas Hart
Carter B. Harrison, IV
Harrison & Hart LLC
Albuquerque, New Mexico

     *Attorneys for the Defendant*

- 25 -